■ Musette Batas et al., Respondents-Appellants, v Prudential Insurance Company of America et al., Appellants-Respondents. [724 NYS2d 3] —Order, Supreme Court, New York County (Herman Cahn, J.), entered May 28, 1999, which, in an action involving the provision of benefits under health insurance policies issued or administered by defendants, granted in part and denied in part defendants' motion to dismiss the complaint, modified, on the law, to reinstate the sixth cause of action, and otherwise affirmed, without costs.

The facts are fairly set forth by the dissent. We would note, however, that plaintiffs bring this action on their own behalf and as representatives of a class of all subscribers to health care plans offered by defendants (Prudential). We also note that neither party challenges the liberal standard applied by

the IAS court wherein, "[o]n a motion to dismiss for failure to state a cause of action, the court must accept all the facts alleged as true, accord the plaintiff the benefit of every possible inference, not evaluate the merits of the case, and determine only whether the facts as alleged fit within any cognizable legal theory (*Leon v Martinez*, 84 NY2d 83)."

Applying that standard, plaintiffs' causes of action for breach of contract, fraud and violations of General Business Law § 349 (a) and § 350 were properly sustained over defendants' objection that, under Public Health Law § 4406, the responsibility for regulating the contracts of Health Maintenance Organizations (HMO's) lies with the Commissioner of the Department of Health. Nothing in that section or elsewhere in the statutory scheme suggests a clear legislative intent to preempt common-law or other rights and remedies (*see, Hechter v New York Life Ins. Co.*, 46 NY2d 34, 39; *cf., Karlin v IVF Am.*, 93 NY2d 282, 292-293). Nor has plaintiffs' challenge to the utilization review procedures that defendants used in connection with plaintiffs' hospital stays, but which allegedly were not those promised in plaintiffs' contracts, been mooted by the enactment of statutorily mandated utilization review procedures in Public Health Law article 49 (*see*, Public Health Law § 4907). Plaintiffs' allegations are also sufficient to show that the two named defendants are alter egos (*see, Van Valkenburgh, Nooger & Neville v Hayden Publ. Co.*, 30 NY2d 34, 42, *cert denied* 409 US 875).

Plaintiffs' allegations that defendants did not conduct the utilization review procedures that they promised in their contracts state a cause of action for breach of contract. Such allegations do not implicate the "filed rate doctrine" since they neither challenge the reasonableness of the filed rate nor claim that plaintiffs should have been treated differently from other subscribers (*see, Kross Dependable Sanitation v AT&T Corp.*, 268 AD2d 874, 874-875). Although plaintiffs sustained no out-of-pocket costs, actual injury is sufficiently alleged in the nonreceipt of promised health care, for which restitution of premiums paid may be an appropriate remedy.

Plaintiffs' fraud claim, which is based on defendants' alleged misrepresentation of facts in materials used to induce potential subscribers to obtain defendants' health policies, is not duplicative of plaintiffs' breach of contract claim (*see, Rosen v Spanierman*, 894 F2d 28, 35). Plaintiffs also adequately plead reliance, and are not required at the pleading stage to set forth with particularity the materials they relied on.

Plaintiffs' breach of fiduciary duty claim was properly

dismissed on the ground that their allegations are insufficient to show that defendants sought to gain their trust and confidence. As acknowledged by plaintiffs on appeal, the sole remaining basis for such cause of action is the allegation that defendants failed to disclose to their policyholders that they based their determination of what is medically necessary on utilization review guidelines—including the Milliman & Robertson Guidelines—which allegedly conflict with generally accepted medical standards and usurp the role of their own primary care physicians. The crux of plaintiffs' claim is that because current subscribers must decide éach year whether to remain in the Prudential health care system, defendants breach the fiduciary duties owed to such subscribers by continuing to misrepresent their utilization review procedures.

The dissent concludes that because of the shocking factual allegations of the complaint, stating in essence that plaintiffs were prevented from receiving timely and necessary treatment for serious medical conditions, plaintiffs' fourth cause of action seeking to impose a fiduciary duty on a health insurer in this context should be read to constitute a viable cause of action by the substitution of the words "duty of good faith" instead of "fiduciary duty." Such argument relies in large part upon the recent decision in *Pegram v Herdrich* (530 US 211), a case cited by none of the parties on appeal, which involved an HMO dispute under ERISA (Employee Retirement Income Security Act of 1974). In urging such alternative basis for relief, the dissent acknowledges that a fiduciary duty under ERISA is inapplicable to defendants here, but argues that its existence has some relevance when considering whether medical insurers may be considered to have a fiduciary duty to their policyholders.

However, without deciding the issue, all the Supreme Court stated, in a footnote, in dicta, was that "it could be argued" that an HMO is a fiduciary insofar as it has discretionary authority to administer its health insurance plan and so would be obligated to disclose characteristics of the plan if that information affects beneficiaries' material interests (530 US 211, 227 n 8, citing *Glaziers & Glassworkers Union Local No. 252 Annuity Fund v Newbridge Secs.*, 93 F3d 1171, 1179-1181 ["discussing the disclosure obligations of an *ERISA* fiduciary" (emphasis added)]).

Relying on an HMO's possibly arguable obligation to "disclose characteristics of the plan * * * that * * * affects beneficiaries' material interests," (*id.*) the dissent concludes that it is understandable that a policyholder might assume that her

medical insurer's authority to administer its insurance plan creates a comparable fiduciary duty under the common law.

However, in *Pegram,* the sole case relied upon as a possible basis for imposing a fiduciary duty on an HMO pursuant to ERISA, the Supreme Court, as recognized by the dissent, specifically held that "mixed eligibility" decisions of this type, i.e. a combination of "eligibility" and "treatment" decisions, are not fiduciary decisions under ERISA (*supra,* at 237). As one commentator has noted: "Recognizing that Congress has promoted HMOs as an institution for many years, and that these decisions are very different from traditional common law fiduciary decisions, the Court held that mixed eligibility decisions by HMO physicians are not fiduciary decisions under ERISA." (Scott M. Riemer, Outside Counsel, *HMOs Face a Post-'Pegram' World,* NYLJ, July 13, 2000, at 1, col 1, at 36, col 5.)

The Supreme Court, in *Pegram* (*supra,* 530 US, at 231) specifically doubted that Congress would ever have thought of a mixed eligibility decision as fiduciary in nature because, at common law, fiduciary duties characteristically attach to decisions from managing assets and distributing property to beneficiaries. Indeed, the Court noted: "[W]hen Congress took up the subject of fiduciary responsibility under ERISA, it concentrated on fiduciaries' financial decisions, focusing on pension plans, the difficulty many retirees faced in getting the payments they expected, and the financial mismanagement that had too often deprived employees of their benefits" (*supra,* at 232 [citations omitted]).

The dissent attempts to bootstrap its argument by making a quantum leap from an inconclusive footnote in *Pegram* to the legally untenable position that defendants' decision to limit the length of plaintiffs' hospital stays violated a non-existent fiduciary duty qua "duty of good faith." Thus, the dissent would analogize defendants' so-called fiduciary duty to an insurer's tort liability for its bad faith failure to settle third-party claims against its insured.

Clearly, the Supreme Court's reasoning in *Pegram* was based upon the HMO's status as a statutory fiduciary under ERISA. Here, however, as the IAS court noted, "Plaintiffs do not allege that either of these health care plans are covered by ERISA, or that defendants are statutory fiduciaries under ERISA, and thus subject to the more extensive fiduciary duties imposed therein." Nor is there any State statutory basis for imposing such a duty. In light of that, any claim of a breach of fiduciary duty on the part of defendants in this case would have to rely

upon common law principles and plaintiffs would first have to show the existence of such a duty.

A breach of fiduciary duty is a tort and, almost 120 years ago, the Court of Appeals, with regard to a tort arising from a breach of contract, stated: "Ordinarily, the essence of a tort consists in the violation of some duty due to an individual, which duty is a thing different from the mere contract obligation. When such duty grows out of relations of trust and confidence, as that of the agent to his principal or the lawyer to his client, the ground of the duty is apparent, and the tort is, in general, easily separable from the mere breach of contract" (*Rich v New York Cent. & Hudson Riv. R. R. Co.*, 87 NY 382, 390). However, other than in exceptional cases, a cause of action sounding in tort, whether for fraud or otherwise, cannot depend upon a fiduciary or other character of the relationship created by the contract alone, for no such relationship exists (*id.* at 395).

Plaintiffs make no showing that their relationship with defendants is unique or differs from that of a reasonable consumer and offer no reason to depart from the general rule that the relationship between the parties to a contract of insurance is strictly contractual in nature. No special relationship of trust or confidence arises out of an insurance contract between the insured and the insurer; the relationship is legal rather than equitable (68A NY Jur 2d, Insurance, § 651).

As found by the IAS court, plaintiffs "have alleged no facts which suggest that defendants may have practiced the kind of overreaching found in *Meagher* [*Meagher v Metropolitan Life Ins. Co.*, 119 Misc 2d 615] or which point to the existence of any other special circumstance that might indicate other than an arm's length association or that might give rise to a fiduciary relationship." Rather, it found, the only claimed basis for such a relationship is alleged to be defendants' superior knowledge of their product, and a posting of promotional material on their web page in which they tout themselves as a "trusted name" in health insurance. The IAS court concluded that, in the absence of some additional allegation showing a more direct or affirmative effort by defendants to gain plaintiffs' trust and confidence, for example the sales efforts by a salesman or the actions of a representative, no fiduciary relationship is alleged.

Such conclusion is in accord with this Court's decision in *Gaidon v Guardian Life Ins. Co.* (255 AD2d 101, *mod on other grounds* 94 NY2d 330, *mod upon remittitur* 272 AD2d 60), wherein, in affirming the dismissal of an insured's cause of action for breach of fiduciary duty against his insurer, this Court

found that the alleged reliance and trust necessary for a finding of a fiduciary or confidential relationship to support such a cause of action were stated in conclusory fashion and that defendant insurer's superior knowledge did not create such a relationship. Accordingly, for the same reasons, we affirm the dismissal of plaintiffs' fourth cause of action for breach of fiduciary duty.

While we agree that an insured should have an adequate remedy to redress an insurer's bad faith refusal of benefits under its policy, the dissent's proposed new cause of action for tortious breach of the implied covenant of good faith has no basis in the record or briefs.

The dissent claims that there is substantial reason for imposing on health insurers some special, tort duty of good faith towards their policyholders to enable them to recover damages for resulting injuries. However, plaintiffs here make no such claims of injury. Plaintiffs' argument regarding the dismissed fourth cause of action is limited by their briefs to the claim that Prudential breached its fiduciary duty by failing to notify its policyholders that it is relying upon the Milliman & Robertson Guidelines, thereby misrepresenting its utilization review procedures and inducing plaintiffs to continue as policyholders. As pointed out above, all other claims regarding plaintiffs' treatment have been abandoned as regards that cause of action.

The IAS court specifically noted that,"[w]hile plaintiffs contend that these 'premature' discharges placed their health at risk, neither plaintiff has alleged any adverse physical consequences as a result of these determinations, or incurred out-of-pocket expenses for improperly denied coverage. Instead, the two named plaintiffs are seeking a refund of paid premiums, disgorgement of profits, and various forms of equitable relief on their contract claims, as well as punitive damages on the breach of the implied covenant of good faith and fair dealing claim." Thus, the valid concerns expressed by the dissent and its well intentioned proposal of a brand new cause of action would grant relief not asked for by any party. Recognizing that plaintiffs' allegations are insufficient to satisfy the requirement of injury, the dissent nevertheless would afford plaintiffs an opportunity to replead, again relief never sought below. Indeed, the plaintiffs do not challenge the IAS court's dismissal of their identical third cause of action alleging breach of the implied covenant of good faith and fair dealing, which the court found was "so redundant of plaintiffs' breach of contract claim as to require dismissal."

Finally, the allegations of one of the plaintiffs that defendants acted outside the scope of their authority as policy administrators in pre-authorizing her treatment and conducting a concurrent review of the medical necessity of her hospital care and length of stay, when her policy with her employer provided that such decisions were to be made by an in-network primary care physician, are sufficient to state a cause of action for tortious interference with contract (*see, Hoag v Chancellor, Inc.*, 246 AD2d 224, 228-230). Accordingly, we modify to reinstate the sixth cause of action. Concur—Williams, J. P., Andrias and Lerner, JJ.

Wallach and Saxe, JJ., dissent in part in a memorandum by Saxe, J., as follows: When a pleading alleges conduct that manifestly constitutes a wrong, a court that is asked to decide a motion to dismiss addressed to that pleading under CPLR 3211 should not be limited in its inquiry to whether the allegations support the cause of action as pleaded. Rather, the court must consider whether, accepting the allegations as true, *any viable* cause of action exists, entitling the plaintiff to a remedy. To do otherwise would sanction a return to those long-forgotten days when the rigors of common-law pleading determined the life of an action solely from the choice of the writ made. Here, in view of the allegations contained in the complaint, plaintiffs' fourth cause of action, in which they plead a breach of fiduciary duty, should be read to constitute a viable cause of action. Even if the established law of this State precludes a claim for the tort of breach of fiduciary duty under circumstances such as these, we believe that the alleged conduct of the defendants is sufficient to sustain a substantially similar tort claim, recognized elsewhere, which should be adopted and applied here. Therefore, to the extent the majority affirms the dismissal of plaintiffs' fourth cause of action, we disagree and respectfully dissent.

## Facts

Plaintiff Musette Batas (Batas) obtained health care coverage from Prudential Health Care Plan of New York, Inc. (PruCare-NY), a wholly-owned subsidiary of the Prudential Insurance Company of America (Prudential), the largest health insurance carrier in North America, serving, at present, approximately 4.5 million people. Batas is afflicted with Crohn's Disease, a chronic condition causing severe and often times debilitating inflammation of the intestines. On March 19, 1996, Batas, then six months pregnant, suffered a sudden attack and was admitted to a Prudential participating hospital. While

Prudential authorized Batas's stay for one day, Batas's primary care physician requested approval for additional days due to Batas's serious intestinal swelling. On March 22, 1996, Prudential concluded that further hospitalization was not "medically necessary." The decision was based upon a Prudential Concurrent Review Nurse's survey of Batas's chart, completed without an examination of Batas or consultation with her physician. Because she could not afford to remain hospitalized without insurance, Batas elected to be discharged.

On March 29, 1996, 10 days after the initial attack, Batas was rushed to the emergency room with a high fever and severe pain. Her treating physician determined that exploratory surgery was necessary and requested pre-approval from Prudential, but received no response. On April 1, 1996, the exploratory surgery still not authorized, Batas's intestine burst. She was rushed to the emergency room, where a portion of her colon was removed. Two days later—and five days after the request—Prudential "preauthorized" the exploratory surgery.

Four days after the emergency surgery, while Batas was recovering in the hospital, Prudential's Concurrent Review Nurse contacted Batas's treating physician and demanded that Batas be discharged. Her physician refused. On April 12, 1996, the Nurse reviewed Batas's medical records, consulted the "Milliman & Robertson Guidelines"[1] and determined that further hospitalization was not "medically necessary." Unable to afford the costs of continued care, Batas was discharged the following day.

Plaintiff Nancy T. Vogel, an employee of The Lutheran Church-Missouri Synod (the Synod), receives health care benefits through the Concordia Health Plan, the Synod's self-funded employee benefit plan. The Synod hired Prudential to administer its health care plan pursuant to an Administrative Agreement.

On March 26, 1996, Vogel was admitted to a participating Prudential hospital to undergo a total abdominal hysterectomy due to a fibroid tumor in her uterus, which was so large that she appeared six months pregnant. The surgery was performed that day, lasted twice as long as usual, and resulted in the removal of two tumors weighing in excess of 3½ pounds. Because of the complex nature of the surgery and potential for postop-

---

1. According to information provided by Milliman & Robertson's Web site at the time, <http://www.milliman-hmg.com/publications/hmg/hmgqa.html>, the "Milliman & Robertson Healthcare Management Guidelines" are "a set of optimal clinical practice benchmarks for treating common conditions for patients who have no complications."

erative complications, Vogel's primary care physician, along with three previously consulted gynecologists, advised that Vogel remain in the hospital for at least 96 hours.

Yet, on March 28, 1996, merely 48 hours later, a Prudential Concurrent Review Nurse surveyed the "Milliman & Robertson Guidelines" and concluded that further hospitalization was not "medically necessary." At 5:30 P.M., the Nurse informed Vogel's treating physician that Vogel should be discharged immediately. Though the physician adamantly disagreed, he was unable to reach Prudential, whose offices were closed. Vogel received a letter that night informing her that further hospitalization benefits were denied, and, due to financial constraints, was discharged the following morning.

Plaintiffs' complaint contained causes of action for (1) violations of New York General Business Law article 22-A (deceptive acts and practices and false advertising); (2) breach of contract; (3) breach of implied covenant of good faith and fair dealing; (4) breach of fiduciary duty; (5) common law fraud and deceit; (6) improper interference with existing contractual relationships on behalf of the subclass of Synod employees who receive health benefits through the Concordia Health Plan; and (7) declaratory and injunctive relief voiding certain insurance provisions as against public policy.

On defendants' dismissal motion, the IAS court granted dismissal of the third (implied covenant of good faith), fourth (fiduciary duty), sixth (tortious interference), and seventh (injunctive and declaratory relief)[2] causes of action, and otherwise denied the motion. For the reasons that follow, we would modify so as to reinstate the causes of action for breach of fiduciary duty as well as that for tortious interference, and otherwise affirm.

## Breach of Fiduciary Duty

Although the motion court correctly dismissed plaintiffs' fiduciary duty claim insofar as it related to prospective subscribers, it also aptly remarked that the analysis used in older cases, presuming an arm's length business relationship between insured and insurer, is no longer viable. We agree with that assessment. In any event, even if the law of this State does not permit application of the concept of "fiduciary duty" to insurers in relation to their policyholders in general, the cause of action may be saved by a simple substitution of the words "duty of good faith" instead of "fiduciary duty." This alteration results

---

**2.** Plaintiffs do not appeal from that portion of the ruling dismissing their seventh cause of action.

in a viable cause of action which carries out plaintiffs' intention of asserting against defendants a breach of a tort duty, while avoiding any limitations created by the word "fiduciary." Accordingly, we would reverse the IAS court's dismissal of plaintiffs' fourth cause of action, for breach of fiduciary duty, to the extent it relates to plaintiffs as current subscribers.

The nature of the relationship between a medical insurer and its policyholder, in our society, is not simply that of two parties to an arm's length contract. Medical insurance is a necessity since, as has been widely recognized, the cost of medical treatment is often unaffordable, and treatment therefore unattainable, unless medical insurance is available to cover it (*see, e.g.*, Krugman, *The Age Boom: The Economics of the Boom; Does Getting Old Cost Society Too Much?*, New York Times, Mar. 9, 1997, section 6, at 58, col 1). In obtaining it, consumers are forced to place their trust in the accuracy and truthfulness of the insurer's representations as to the extent and scope of the coverage provided, relying upon the good faith of the insurer. Furthermore, the typical consumer in the throes of a serious medical condition has no choice but to abide by the determination made by the insurer, since very few individuals are able to independently afford the costs of serious medical treatment and hospitalization; certainly, the plaintiffs here could not. Therefore, when a medical insurer's handling of a case is contrary to the manner promised, that conduct may constitute more than simply a breach of contract.

Indeed, for some time, courts and commentators have noted the fundamental injustice in applying a traditional contract analysis to disputes between insurers and their policyholders (*see generally*, Note, *The Availability of Excess Damages for Wrongful Refusal to Honor First Party Insurance Claims—An Emerging Trend*, 45 Fordham L Rev 164, 167; Sykes, *"Bad Faith" Breach of Contract by First-Party Insurers*, 25 J Legal Studies 405, 408-409; Harvey and Wiseman, *First Party Bad Faith: Common Law Remedies and a Proposed Legislative Solution*, 72 Ky LJ 141, 167-169; *see also*, 14 Couch, Insurance 3d § 198:15, at 198-29).

Where an insurer has intentionally avoided covering, or paying for, a benefit provided for in its insurance policy, the insured should have available a cause of action providing for an adequate remedy to redress the wrong. Nevertheless, in cases of this kind, a standard contract analysis is traditionally applied. The insured who proves that an insurer has breached its policy is deemed to be fully compensated with money damages calculated by the loss of the "benefit of [the] bargain" (*see,*

*Freund v Washington Sq. Press*, 34 NY2d 379, 382; *see generally*, Dobbs, Remedies, at 148; Farnsworth, *Legal Remedies for Breach of Contract*, 70 Colum L Rev 1145, 1159). While the classical rule of *Hadley v Baxendale* (156 Eng Rep 145) provides for an award of reasonably foreseeable, "consequential" damages, insurance policies are traditionally viewed as contracts for the payment of money only, and therefore this measure of damages is traditionally limited to the amount of the policy plus interest (*see*, Note, *The Availability of Excess Damages for Wrongful Refusal to Honor First Party Insurance Claims—An Emerging Trend*, 45 Fordham L Rev 164, 167, *supra*).

But, an award, at the conclusion of litigation, of money damages equal to what the insurer should have paid in the first place, may in certain circumstances be inadequate. Among other things, this concept of limited damages presumes that a plaintiff has access to an alternative source of funds from which to pay that which the insurer refuses to pay. This is frequently an inaccurate assumption, particularly when it comes to the enormous cost of hospitalization, surgery, and related in-patient medical care. Furthermore, an insurer's breach of a health insurance contract may result in further physical injury, as well as pain, suffering, and emotional damage caused by the delay in, or complete inability to obtain treatment, as the present case illustrates. Contract damages, limited to the amount due under the policy (plus interest), do not in this context achieve the goal of contract damages, which is to place the plaintiff in the position she would have been in had the contract been performed. Indeed, if statutory interest is lower than that which the insurer can earn on the sums payable, the insurer has a financial incentive to decline to cover or pay on a claim.

Since contract analysis and contract remedies are so apparently inadequate, many States have responded to this clear need for a tort remedy in the insurance context by adopting a tort cause of action. Many have framed the tort as one for breach of the implied covenant of good faith and fair dealing (*see, e.g., Gruenberg v Aetna Ins. Co.*, 9 Cal 3d 566, 510 P2d 1032; *Bibeault v Hanover Ins. Co.*, 417 A2d 313 [RI]), or for the tort of "bad faith," defined as an insurer's denial of a claim without reasonable basis (*see, e.g., Anderson v Continental Ins. Co.*, 85 Wis 2d 675, 271 NW2d 368; *State Auto Prop. & Cas. Ins. Co. v Swaim*, 338 Ark 49, 55-56, 991 SW2d 555, 559; *Christian v American Home Assur. Co.*, 1977 Okla 141, 577 P2d 899). Other States have enacted statutes providing for a right to bring a first party bad faith claim against an insurer (*see, e.g.*, Fla Stat Annot § 624.155; 42 Pa Cons Stat § 8371). Yet an-

other court, although it declined to impose tort liability for bad faith, has remarked that a breach of the covenant of good faith and fair dealing by an insurer may warrant an award of consequential damages beyond merely the policy limits (see, Beck v Farmers Ins. Exch., 701 P2d 795, 799-800 [Utah]).

While New York common law has adopted a tort involving bad faith breach of contract by an insurer, that tort is narrow and inapplicable to circumstances such as these. Such a claim for bad faith breach of an insurance contract, entitling a plaintiff to punitive damages, is limited to circumstances beyond merely a failure to perform the contract, and must involve egregious patterns of tortious conduct directed at the public at large as well as the individual claimant (see, Rocanova v Equitable Life Assur. Socy., 83 NY2d 603, 615; New York Univ. v Continental Ins. Co., 87 NY2d 308). Although the egregious facts alleged here may well fall within its parameters, this extremely high threshold will not apply to most bad faith denials of benefits.

The jurisprudence of this State also provides for a cause of action against an insurer which in bad faith refuses to settle a liability claim against its insured; however, that cause of action, too, is inapplicable to situations like the present, in which insurers deny their own policyholders coverage provided for under the policy, or otherwise improperly avoid payment on first-party claims. A claim against a liability insurer for "bad faith refusal to settle" does not require, as in Rocanova (supra), a wrong against the public at large, but is satisfied where "the insurer's conduct constituted a 'gross disregard' of the insured's interests—that is, a deliberate or reckless failure to place on equal footing the interests of its insured with its own interests when considering a settlement offer" (see, Pavia v State Farm Mut. Auto. Ins. Co., 82 NY2d 445, 453). Where such a case is successfully made out, the permissible damages[3] may exceed the policy limits, by including the amount of the ultimate judgment entered against the insured in excess of the policy limits (see, Pavia v State Farm Mut. Auto. Ins. Co., 82 NY2d 445, 453). But, this "bad faith" cause of action, too, is inapplicable to insureds who have been improperly foreclosed from obtaining medical care to which they were entitled under their policy.

What is needed is a cause of action permitting an appropriate remedy when an insurer acts in bad faith in denying its own insured benefits provided for by the policy. This deficiency

---

3. This type of damages has at times been termed "compensatory" (see, AFIA v Continental Ins. Co., 140 AD2d 167, 169) and at other times "punitive" (see, Gordon v Nationwide Mut. Ins. Co., 30 NY2d 427).

could be rectified by adopting the approach of numerous other States, under which a health insurer's obligations to provide promised benefits constitute a tort duty, which would allow for a corresponding tort remedy.

Plaintiffs, by their fourth cause of action, suggest that defendants have such a duty, and have framed that duty as a fiduciary one.

Admittedly, imposition of a fiduciary duty in this State has been limited to circumstances where a relationship of trust and confidence has been created between those particular parties (*see, Zimmer-Masiello, Inc. v Zimmer, Inc.,* 159 AD2d 363, *appeal dismissed* 76 NY2d 772), while the relationship between an insurer and a policyholder has been viewed as an ordinary, arm's length commercial transaction (*see,* 68A NY Jur 2d, Insurance, § 651). Under this traditional view, the term "fiduciary" will normally be seen as inapplicable to a medical insurer, particularly where the dispute concerns a claim for benefits, submitted by an insured to the insurer, since the insurer has no obligation to consider the insured's interests as paramount, but rather, must only provide those benefits which its policy requires (*see, e.g., Gaidon v Guardian Life Ins. Co.,* 255 AD2d 101, *mod on other grounds* 94 NY2d 330; *see generally,* Richmond, *Trust Me: Insurers Are Not Fiduciaries to Their Insureds,* 88 Ky LJ 1).

Despite this State's generally limited application of fiduciary duty, plaintiffs' reliance on the concept of fiduciary duty here was not unreasonable. Among those States recognizing that a tort duty is owed by insurers in relation to claims submitted by their insureds, the exact definition and nature of the duty has not been universally agreed upon.

The concept of fiduciary duty has been applied most frequently in the insurance context in the area of liability insurance. "[T]he nature of an insurer's relationship with and duty to the insured" has in different contexts been variously described as "special," "fiduciary" and "quasi-fiduciary" (14 Couch, Insurance 3d § 198:7, at 198-14; *and see, e.g., Powers v United Servs. Auto. Assn.,* 114 Nev 690, 700, 962 P2d 596, 602; *Decker v Browning-Ferris Indus.,* 931 P2d 436, 443 [Colo]; *Union Bankers Ins. Co. v Shelton,* 889 SW2d 278, 283 [Tex]). Another commentator has characterized the duty owed by the liability insurer to its insured, in the conduct of the litigation and settlement of third-party claims, as "somewhat of a fiduciary one" (*see,* 7C Appleman, Insurance Law and Practice § 4711 at 378; § 4712 at 448 [Berdal ed]), explaining that "[a]s the champion of the insured, [the insurer] must consider as

paramount his interests, rather than its own, and may not gamble with his funds" (7C Appleman, *supra*, at 378). In fact, in recognition of the power wielded by the insurer, to unilaterally control whether to settle a claim, some courts have specifically characterized the relationship as a fiduciary one (*see, e.g., American Fid. & Cas. Co. v Nichols Co.*, 173 F2d 830, 832; *Allsup's Convenience Stores v North Riv. Ins. Co.*, 127 NM 1, 976 P2d 1, 15).

It is also worth noting that the Federal Employee Retirement Income Security Act ([ERISA] 29 USC § 1001 *et seq.*) imposes a fiduciary duty upon plan administrators (*see*, 29 USC § 1102 [a]; § 1104). Although that fiduciary duty is inapplicable to defendants here, its existence has some relevance when considering whether a medical insurer may be considered to have a fiduciary duty to its policyholders. Indeed, in a recent opinion refining the scope of the rights and remedies available to patients of Health Maintenance Organizations (HMOs), the United States Supreme Court, in a footnote, specifically left open the possibility that an insured patient could claim that an HMO breached its fiduciary duty to a patient when the HMO's conduct was administrative in nature (*see, Pegram v Herdrich*, 530 US 211). Although the Court dismissed a patient's fiduciary duty claim against an HMO because it was based upon an HMO physician's "mixed eligibility" decision concerning how to test the patient for purposes of diagnosing a medical condition, it noted that an HMO "is a fiduciary insofar as it has discretionary authority to administer the plan, and so * * * is obligated *to disclose characteristics of the plan* and of those who provide services to the plan, if that information affects beneficiaries' material interests" (*id*. at 227, n 8 [emphasis added]). Such a failure to disclose important characteristics of the plan is exactly the nature of the claim plaintiffs are pressing here. So, it is understandable that a policyholder might assume that her medical insurer's authority to administer its insurance plan creates a comparable fiduciary duty under the common law.

Even if we decline to apply the concept of fiduciary duty to circumstances such as those presented, imposition of a duty of good faith such as has been adopted elsewhere *is* appropriate, and comports with the reasoning by which insurers are held to have acted in bad faith in other respects. Examination of the rationale behind the "bad faith refusal to settle" rule that has

evolved in the area of third-party liability claims[4] discloses that the policies and considerations behind its creation are also applicable in the area of first-party claims[5] for medical insurance coverage. "At the root of the 'bad faith' doctrine is the fact that insurers typically exercise complete control over the settlement and defense of claims against their insureds, and, thus, under established agency principles may fairly be required to act in the insured's best interests." (*Pavia v State Farm Mut. Auto. Ins. Co.*, 82 NY2d 445, 452, citing 7C Appleman, Insurance § 4711 [Berdal ed]). The *Pavia* Court noted that the concept of bad faith failure to settle recognizes the insurer's temptation to advance its own financial interest at the expense of its insured, despite the likelihood that the insured would as a result be personally liable for a large judgment in excess of the policy limits (*id.* at 452-454).

The very same kinds of concerns articulated in the area of bad faith failure to settle come into play in the context of first-party claims for medical insurance coverage. In both, there may be a conflict between the insurer's financial position and the competing interests, financial and otherwise, of the insured. And, importantly, there is the possibility of catastrophic results to the insured when the insurer acts wrongfully, that is, contrary to the terms of the policy, in order to advance its own interests rather than protect those of the insured. Indeed, instead of merely being faced with a large money judgment in excess of the policy, an insured who is victimized by bad faith conduct of a medical insurer may be faced with the inability to obtain necessary, perhaps critical, medical care.

Furthermore, the position of the medical insurer is, like that of the liability insurer in the context of claim settlement, one of total control; that of the insured patient is one of powerlessness. The typical consumer in the throes of a serious medical condition has no choice but to abide by the determination made by the insurer. Very few individuals are able to independently afford the costs of serious medical treatment and hospitalization.

When we consider the nature of the health insurance

---

4. "[I]f the insurer's duty to defend and pay runs to a third-party claimant who is paid according to a judgment or settlement against the insured, then the insurance is classified as 'third-party insurance'" (*Great N. Ins. Co. v Mount Vernon Fire Ins. Co.*, 92 NY2d 682, 688, citing 1 Holmes, Appleman on Insurance 2d § 3.2, at 342).

5. " 'First-party coverage' pertains to loss or damage sustained by an insured to its property; the insured receives the proceeds when the damage occurs" (*Great N. Ins. Co. v Mount Vernon Fire Ins. Co.*, 92 NY2d 682, 687-688, citing 1 Holmes, Appleman on Insurance 2d § 3.2, at 342).

industry, it becomes apparent that medical insurers, even more than most, should be held to a special standard of conduct toward their policyholders, beyond that required of parties to an ordinary, commercial contract. Even accepting that a formal fiduciary duty is inapplicable in this context under the traditional approach of this State, there is substantial reason for imposing on insurers, particularly health insurers, some special, tort duty of good faith toward their policyholders, a violation of which may entitle the policyholder to recover damages for resulting injuries, rather than merely a belated award of that which the insurer should have paid initially.

Indeed, there is no convincing rationale for failing to provide a tort[6] remedy for the actual damages potentially incurred by aggrieved policyholders when an insurer has unreasonably, and in bad faith, declined to cover necessary medical care, by wrongfully disclaiming coverage. Even if the law declines to impose a formal fiduciary duty in this context, there is every reason to impose a tort duty of good faith.

Although plaintiffs' claim specifically states that it seeks damages for breach of fiduciary duty, its allegations should be read liberally so as to consider whether plaintiffs have any cognizable cause of action (see generally, CPLR 104, 3026). "On a motion to dismiss pursuant to CPLR 3211, the pleading is to be afforded a liberal construction (see, CPLR 3026). We accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory." (Leon v Martinez, 84 NY2d 83, 87-88.) In Leon v Martinez, despite the plaintiffs' failure to mention the word "assignment" or designate a cause of action as seeking damages for breach of an assignment, or even to claim such a cause of action on appeal, the Court held that the complaint "adequately alleged for pleading survival purposes that the instrument prepared by [the lawyer] was intended by all parties to effectuate a present assignment to plaintiffs of interests in the future settlement" (84 NY2d at 88, supra).

I conclude that the shocking factual allegations in this case support a viable claim for a tortious breach of defendant's duty

---

**6.** While fraud claims have sometimes been employed to serve the purpose of obtaining adequate damages (see, Availability of Excess Damages, 45 Fordham L Rev at 173, supra), and indeed, plaintiffs have successfully pleaded a fraud cause of action here, the theoretical possibility of a claim of fraudulent inducement does not obviate the need for adoption of a tort cause of action against an insurer who unjustifiably denies a valid claim. Such a tort claim should be available regardless of whether the plaintiff can successfully demonstrate the elements of fraud.

of good faith, and accordingly, it is appropriate to permit plaintiffs' fourth cause of action to proceed. Although I consider the allegations of the complaint, taken as a whole, to be sufficient to establish the cause of action, if the allegations are deemed insufficient to satisfy the requirement of injury, then plaintiffs should be offered the opportunity to replead.

Lastly, these allegations of this cause of action are not merely duplicative of plaintiffs' existing causes of action for breach of contract or fraudulent inducement. The fraudulent inducement claim is based upon the assertion that in their handbooks, directories and Web site, defendants falsely represented that they apply generally accepted medical standards in determining medical necessity, as distinct from the allegation that defendants failed to disclose to subscribers their intention to use the Milliman & Robertson Guidelines exclusively.