Vera **MULLER–PAISNER, as Executrix of the Estate of Mary Engel, deceased, Plaintiff,**

v.

**TIAA, TIAA–CREF Enterprises, Inc., Teachers Insurance and Annuity Association, and College Retirement Equities Fund, Defendants.**

**No. 03 Civ. 6265(DAB).**

United States District Court,
S.D. New York.

Aug. 14, 2006.

Max Wild, Law Offices of Max Wild, Goshen, NY, for plaintiff.

*MEMORANDUM & ORDER*

BATTS, District Judge.

Vera Muller–Paisner ("Plaintiff") brings suit against TIAA, TIAA–CREF Enterprises, Inc., Teachers Insurance and Annuity Association, and College Retirement Equities Fund, collectively known as TIAA–CREF ("TIAA" or "Defendants"). The suit arises out of Defendants' allegedly fraudulent sale of an annuity to Decedent Mary Engel ("Decedent"), which caused substantial losses to Decedent's estate. Plaintiff Executrix of Decedent's estate, who is seeking punitive damages and attorney's fees, asserts the following claims against Defendants: (1) common law fraud; (2) breach of fiduciary duty; (3) negligence; and (4) securities fraud. Defendants move to dismiss the Complaint under Federal Rules of Civil Procedure 12(b)(6) and 9(b) for failure to state a claim and for failure to plead fraud with particu-

larity. Defendants also move to strike Plaintiff's claims for punitive damages and attorney's fees.

For the reasons set forth below, Defendants' motion to dismiss is GRANTED.

## I. BACKGROUND

Decedent Mary Engel was a 70–year old college professor who had accumulated approximately $1,342,555 in retirement benefits after 30 years of teaching. (Compl.¶¶ 8, 9.) She died of emphysema on March 10, 2001, approximately six months after she retired. (Compl.¶ 1, 8.) Plaintiff Vera Muller–Paisner is the executrix of Decedent's estate. (Compl. at 1.) Defendants, collectively known as TIAA–CREF, are a group of corporations, all of which exist and are organized pursuant to the laws of the State of New York, with a principal place of business in New York. (Compl.¶ 2.) Defendants provide the principal retirement system for the nation's education and research communities, serving approximately 2.5 million people, including Decedent Engel. (Compl.¶ 14.) Plaintiff alleges that Decedent Engel was defrauded when she was induced to purchase a life annuity from Defendants because Defendants misrepresented the fact that the annuity had a guaranteed period and that Decedent would be able to name a beneficiary, and they also failed to inform her of other available retirement options that might have made more sense financially.

According to Plaintiff, Defendants represent that they have an infrastructure "to help people identify the resources that best fit their needs as they pass from one period of life to another." (Compl.¶ 15.) According to Plaintiff, Defendants held themselves out as being willing to and capable of providing investment advice and guidance to the plan participants, and to provide such investment advice, they have established "counseling centers," which participants can call to obtain investment advice and guidance. (Compl.¶ 17.)

On September 27, 1999, Mary Engel executed her last will and testament, which provided for the distribution of her assets at the time of her death, including $50,000 to a friend she later married, and also directed the establishment of a trust to pay $4,000 per month to Plaintiff for life, with the remainder to Decedent's nephew, if he survived Plaintiff, or else to a nonprofit organization. (Compl.¶ 10.) The trust, which was to be funded from Decedent's estate, would have required approximately $700,000. (Compl.¶ 10.) Decedent retired on or about September 1, 2000. At this time, Decedent also apparently was planning to purchase a house, which Decedent brought to Defendants' attention numerous times. (Compl.¶ 35.)

Before Decedent purchased the annuity, she obtained advice from Defendants regarding her retirement options: she wrote numerous letters to Defendants, and had at least six telephone conversations with different counselors. (Compl.¶ 33.) In a letter dated February 8, 2000, Decedent wrote to Defendants and stated, "I wish to cash in one tenth of my TIAA accumulation that came from previous employment at Harvard University and at the University of Michigan. I am enclosing Transfer Payout Annuity papers from these universities." (Defs.' Notice of Motion, Ex E.) On August 22, 2000, Decedent wrote a letter to Defendants in which she stated in part, "I understand that my accumulation is $1,342,554.81 as of August 21, 2000. I wish to roll into an IRA $100,000 of this. Please include Transfer Payout Annuity in the sum on which you base my monthly check. Please set up single life annuity without a guaranteed period, standard payment method." (Defs.' Notice of Motion, Ex H.) Decedent enclosed with this August 21, 2000 letter completed forms

labeled, "Authorization to Begin Retirement Income from Retirement Annuities or Group Retirement Annuities." (Defs.' Notice of Motion, Ex H.) On September 5, 2000, Decedent wrote a letter to Defendants in which she stated, "Confirming: annuitize 100% remaining TIAA–CREF accounts under standard method, 0 year survivorship." (Compl.¶ 37.) The September 5, 2000 letter, which complained of the treatment Decedent had received from the counselors, also stated, "I am ill and cannot come to your offices. My request to you suffers from lack of continuity; I have spoken to many counselors and written and sent materials. Yet nothing of substance appears to happen." (Compl.¶ 37.)

On September 1, 2000, Decedent purchased the annuity in question. (Compl.¶ 11.) The annuity required the payment of nearly all of Decedent's moneys, which totaled approximately $1.2 million, and had no guaranteed refund or pay period. (Compl. at 1, ¶ 11.)

Defendants sent Decedent a booklet entitled, "Your Service Directory," which stated it was prepared for Mary S. Engel. (Compl.¶ 34.) Section I entitled "Summary of Your Annuity Payment Arrangements" states under "Income Option," "Life Annuity with No Guaranteed Period–Under this option, you receive income. Upon your death, all payments stop." (Compl.¶ 34.) According to Plaintiff, sections II and III of the booklet give the impression that after starting to receive annuity benefits, one could elect to change the annuity income sources and income stream and could change the beneficiary. (Compl.¶ 34.)

In a "Record of Conversation" dated August 22, 2000, one of the counselors stated in the "Remarks" section, "Assisted [Engel] with annuity income forms. She is considering a single life annuity. [ ] She

doesn't have any beneficiaries, so she is comfortable with the single life annuity." (Defs.' Notice of Motion, Ex. F.) In a "Record of Conversation" dated August 30, 2000, one of the counselors stated in part, "The Participant appeared very hard of hearing. I attempted to offer help with her allocation questions, but she declined. I also attempted to ask if she really wanted to use all of her funds in the conversion of a single life annuity knowing that all payments end with her death with no provision for any beneficiary at all. At her age and the balance involved a full annuity would be against the normal logic. I am not sure that she really understood what I was asking." (Defs.' Notice of Motion, Ex. I; Pl.'s Mem. at 20, n. 4.) In a "Record of Conversation" dated August 31, 2000, one of the counselors stated in part, "I also confirmed again with [Engel] that she wanted to annuitize 100% with no guarantee period in SLO. [Engel] stated that she was a Holocaust survivor and has no family for which she should leave funds. I explained to [Engel] should she annuitize she would not have a lump sum of cash to access if future expenses should arise. I explained she could not accelerate payments. I suggested an alternative that she could partially annuitize and take MD withdrawals from remaining portions but she would have the benefit of accelerating MD payments or taking single sum withdrawals if she needed to. [Engel] did not realize this was an option and said she needed to think about it." (Defs.' Notice of Motion, Ex. I; Pl.'s Mem. at 20, n. 4.)

In a memorandum to the file dated August 31, 2000, a counselor stated, "I spoke to ... in counseling, who confirmed [Decedent's] retirement options ... [I] asked that [she] send a ltr confirming her options ...". (Compl.¶ 37.) Plaintiff claims in the Complaint, "In making such notes to defendants' files and causing Decedent to

write such acknowledgments, said Counselors basically wanted to insulate themselves and defendants from legal action because they well recognized that they were causing or at least wrongfully allowing Decedent to make a grossly inappropriate and unsuitable investment and not discharging their legal and moral obligations to help Decedent avoid unsuitable investments and make appropriate choices." (Compl.¶ 39.)

At the time she purchased the annuity, Decedent was suffering from emphysema, which caused her to wheeze and cough virtually uncontrollably, to have difficulty breathing and speaking, and which made her difficult to understand. (Compl.¶ 8.) On August 21, 2000, one of the Defendants' counselors stated in a "Record of Conversation" form used to record telephone contacts with participants that Decedent was "difficult to understand." (Compl.¶ 27.) Plaintiff also claims that the several letters Decedent wrote to Defendants while she was considering her retirement options show Decedent's handwriting was weak and shaky, "strongly suggesting a serious health condition." (Compl.¶ 28.)

On March 10, 2001, Decedent passed away, after receiving six annuity payments. (Compl. at 1–2.) Her last will and testament was admitted to probate in the Court of Probate for the State of Connecticut. (Compl.¶ 1.) After Decedent's death, Plaintiff executrix and Engel's estate attorney requested information from Defendants to ascertain the details of Decedent's investment, and through these efforts, they obtained certain documents, including communications with Decedent and counseling activities. (Compl.¶ 43.) Frustrated with the lack of an adequate response from Defendants, Plaintiff filed the instant lawsuit.

Defendants filed the instant Motion to Dismiss on the following grounds: (1) plaintiff has not adequately alleged securities or common law fraud; (2) the claim for securities fraud is time-barred; (3) no fiduciary duty was owed by TIAA to Decedent; and (4) punitive damages and attorney's fees are not appropriate where the defendants' actions have not been willful or wanton. For the following reasons, Defendants motion is GRANTED.

## II. DISCUSSION

### A. Standard of Review

"On a motion to dismiss under Rule 12(b)(6), the court must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff." *Bolt Elec., Inc. v. City of N.Y.,* 53 F.3d 465, 469 (2d Cir.1995). "The district court should grant such a motion only if, after viewing plaintiff's allegation in this favorable light, 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Walker v. New York,* 974 F.2d 293, 298 (2d Cir.1992) (quoting *Ricciuti v. New York Transit Auth.,* 941 F.2d 119 (2d Cir.1991)). Because a Rule 12(b)(6) motion is used to assess the legal feasibility of a complaint, a court should not "assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980).

The Court notes that Plaintiff argues that Defendants have attempted to convert their motion to dismiss into one for summary judgment by attaching documents outside the Complaint to their moving papers. Consideration of a Rule 12(b)(6) motion is limited to the factual allegations in the complaint, but also may include documents attached to the complaint as exhibits or incorporated by reference, also may include matters of which judicial notice might be taken, and also may include docu-

ments either in plaintiff's possession or of which plaintiffs had knowledge and relied on in bringing suit. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (citing *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir.1991), cert. denied, 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992)). Defendants make clear in their Reply papers that all of the exhibits relied on in their moving papers are referenced by Plaintiff in the Complaint and/or were relied on by Plaintiff in bringing the instant suit. Further, Plaintiff refers to these exhibits in her opposition to Defendants' motion to dismiss. Accordingly, the Court uses these exhibits in its analysis of the instant motion.

### B. Failure to Plead Fraud

Defendants argue that Plaintiff has failed properly to state a claim for relief pursuant to common law fraud and securities fraud under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5. (Defs' Mem. at 6.)

■ The standard for alleging common law fraud and securities fraud essentially are the same. *See Morse v. Weingarten,* 777 F.Supp. 312, 319 (S.D.N.Y.1991) ("[B]ecause these elements [of common law fraud] are substantially identical to those governing § 10(b), the identical analysis applies."). To succeed in a claim for fraud under New York law, a plaintiff must demonstrate that: (1) the defendant misrepresented or omitted a material fact; (2) the defendant intended to deceive plaintiff; (3) the defrauded party justifiably relied upon the misrepresentation; and (4) the plaintiff's injury was caused by the defendant's misrepresentation or omission. *See Morse,* 777 F.Supp. at 319; *see also Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 153 (2d Cir.1995); *Lama Hold-*

*ing Co. v. Smith Barney Inc.,* 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (N.Y.1996).

Section 10(b) and Rule 10b–5 are the general prohibitions on fraud in the Exchange Act. Section 10(b) bars the use "in connection with the purchase or sale of any security" of "any manipulative or deceptive device or contrivance," which are defined by the SEC. 15 U.S.C. § 78j(b). Rule 10b–5 makes it "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange . . . to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or . . . to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

■ To state a cause of action for securities fraud, a plaintiff must plead that "in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff] injury." *Rothman v. Gregor,* 220 F.3d 81, 89 (2d Cir.2000) (quoting *Chill v. General Electric Co.,* 101 F.3d 263, 266 (2d Cir.1996)); *see also S.E.C. v. Prater,* 289 F.Supp.2d 39, 52 (D.Conn.2003) (holding that a plaintiff alleging securities fraud must show that a defendant (1) made a material misrepresentation or a material omission as to which he or she had a duty to speak; (2) with scienter; (3) in connection with the purchase or sale of securities) (citing *S.E.C. v. Monarch Funding Corp.,* 192 F.3d 295, 308 (2d Cir.1999)).

■ To be a material misrepresentation or omission, "the information need not be such that a reasonable investor would necessarily change his investment decision based on the information, as long as a reasonable investor would have viewed it as significantly altering the 'total mix' of information available." *DeMarco v. Robertson Stephens Inc.*, 318 F.Supp.2d 110, 118 (S.D.N.Y.2004) (quoting *SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir.1997)) (citing *TSC Indus., Inc. v. Northway*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). For omissions to constitute securities fraud, a defendant must have had a duty to disclose material facts to the plaintiff. *See, e.g., Chiarella v. U.S.*, 445 U.S. 222, 228, 100 S.Ct. 1108, 63 L.Ed.2d 348, (1980) ("[O]ne who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so. And the duty to disclose arises when one party has information 'that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.'") (quoting Restatement (Second) of Torts § 551(2)(a) (1976)).

■ The scienter element requires that a plaintiff allege facts indicating that defendant has a mental state embracing "intent to deceive, manipulate or defraud." *Fezzani v. Bear, Stearns & Co.*, 384 F.Supp.2d 618, 637 (S.D.N.Y.2004) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). A plaintiff may allege scienter one of two ways: by pleading "motive and opportunity to commit fraud" or "strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 138–39 (2d Cir.2001) (quotations and citations omitted). "Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful non-

disclosures alleged," while "opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994). A plaintiff may also show scienter by alleging facts that show a defendant's conduct was "highly unreasonable, representing an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rothman*, 220 F.3d at 90 (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir.1978)).

Plaintiff alleges that Defendants made material misrepresentations to Decedent by providing her with a booklet that was deceptively written to make it appear to a reasonable reader that one could add a beneficiary to one's annuity. (Pl.'s Mem. at 9.) Plaintiff also claims that Defendants made material omissions to Decedent by failing to make clear to Decedent the adverse consequences that purchasing the annuity would have on her estate plan, and by failing to provide Decedent with information about other investment options. (Pl.'s Mem. at 22.) Plaintiff also argues that Defendants somehow tricked Decedent into writing letters to Defendants as a means of protecting themselves from future lawsuits, which "confirms their recognition that they were deceiving her." (Pl.'s Mem. at 22.)

■ The Court does not find that the booklet Plaintiff complains of contains material misrepresentations: although it contains general boilerplate information about annuities, it clearly states in the first section that Decedent's annuity was not guaranteed and does not state that Plaintiff did or could designate beneficiaries. The allegedly confusing language Plaintiff points to states, "You can change your beneficia-

ry at any time . . .," which implies that one must already have selected a beneficiary to be able to change it. Further, Decedent was provided with detailed information about the annuity and its limitations, and she wrote letters to Defendants acknowledging that the life annuity she had chosen did not provide for payments after her death, and did not include any beneficiaries.

As to whether Defendants made material omissions by not informing Decedent of the possibly negative consequences of her annuity choice and by not informing her of other options, this argument fails as well. Decedent wrote letters on her own letterhead, and filled out and signed the application forms herself. Indeed, she chose to establish a retirement transition benefit of $100,000, indicating that she understood that she had choices. Although Decedent's decision to purchase a life annuity without a guaranteed period, and without a beneficiary, may not make sense, Plaintiff has not shown how Defendants actively defrauded Decedent. Even if Defendants did not inform Decedent of other, potentially better options for her financial needs, they repeatedly informed Plaintiff that the annuity she chose did not include beneficiaries and had no guaranteed period.

Furthermore, even if Plaintiff had successfully alleged that Defendants made material misrepresentations and omissions, the Court finds that Plaintiff has not adequately alleged the scienter element for securities fraud. Plaintiff alleges that Defendants knew that Plaintiff was old and sick, and may have been confused, and used this knowledge so they would reap a windfall.[1] (Pl.'s Mem. at 1.) However, there is no indication that Defendants in-

tended to deceive or manipulate Decedent. Different counselors gave Decedent information about the annuity and verbally counseled her against it. Plaintiff argues that Defendants attempted to protect themselves from a lawsuit by telling Decedent to write letters confirming her choices. But by the same token, Defendants also informed Decedent of the kind of annuity she was purchasing, which indicates a willingness on Defendants' part to enlighten, rather than deceive Decedent.

Accordingly, as Plaintiff has failed to make out the necessary elements for fraud, Defendants' motion to dismiss these claims is GRANTED.

### 2. Failure to Plead with Particularity

Defendants contend that the Complaint fails to plead Plaintiff's claims for securities fraud and common law fraud with the particularity required under Section 10(b), Rule 10b–5, or Fed.R.Civ.P. 9(b). (Defs.' Mem. at 7.) Because the Court finds that Plaintiff's fraud claims fail, there is no reason to analyze whether they were pled with sufficiency.

### D. Breach of Fiduciary Duty

Defendants argue that Plaintiff's breach of fiduciary duty claim fails because TIAA owed no duty to Decedent. (Defs' Mem. at 10.)

The elements of a breach of fiduciary duty claim are: (1) existence of a fiduciary duty; and (2) breach of the fiduciary duty. *In re NYSE Specialists Sec. Litig.*, 405 F.Supp.2d 281, 302 (S.D.N.Y. 2005). When examining whether a fiduciary relationship exists under New York law, a court examines "whether one person has

---

1. Defendants point out in their Reply that if an annuitant dies before the balance of an annuity is paid out, any balance is applied to all other annuitants in the same class, there-fore Defendants themselves do not receive a "windfall" if an annuitant dies early. (Defs.' Reply at 5.)

reposed trust or confidence in the integrity and fidelity of another who thereby gains a resulting superiority or influence over the first." *Teachers Ins. & Annuity Ass'n of Am. v. Wometco Ent., Inc.*, 833 F.Supp. 344, 349–50 (S.D.N.Y.1993); *see also Mandelblatt v. Devon Stores, Inc.*, 132 A.D.2d 162, 521 N.Y.S.2d 672, 676 (N.Y.App. Div. 1st Dep't 1987) ("A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation" (quoting Restatement (Second) of Torts § 874, comment a)). However, fiduciary relationships typically do not arise between parties engaging in arm's length business transactions. *See Abercrombie v. Andrew College*, 438 F.Supp.2d 243, 274 (S.D.N.Y. 2006) (citing *Mid–Island Hosp., Inc. v. Empire Blue Cross and Blue Shield*, 276 F.3d 123, 130 (2d Cir.2002)); *see also Dopp v. Teachers Ins. & Annuity Ass'n*, 1993 WL 404076, *5, 1993 U.S. Dist. LEXIS 13980, at *15 (S.D.N.Y.1993) ("The arm's-length relationship of parties in a business transaction is, if anything, antithetical to the notion that either would owe a fiduciary relationship to the other.").

In New York, insurance brokers and companies generally do not owe a fiduciary duty to those they insure. *See Batas v. Prudential Ins. Co. of Am.*, 281 A.D.2d 260, 724 N.Y.S.2d 3, 7 (N.Y.App. Div. 1st Dep't 2001) (stating that the relationship between the parties to an insurance contract is strictly contractual in nature); *Murphy v. Kuhn*, 90 N.Y.2d 266, 660 N.Y.S.2d 371, 682 N.E.2d 972 (N.Y.1997); *Gaidon v. Guardian Life Ins. Co. of America*, 255 A.D.2d 101, 679 N.Y.S.2d 611, 612 (N.Y.App. Div. 1st Dep't 1998); *Rochester Radiology Assocs. v. Aetna Life Ins. Co.*, 616 F.Supp. 985, 988 (W.D.N.Y.1985) ("I find nothing in the caselaw or New York statutes to indicate that an insurance company is a fiduciary for its policyholders; in fact, the law appears to be to the contrary."). "[I]nsurance agents or brokers are not personal financial counselors and risk managers, approaching guarantor status." *Murphy*, 90 N.Y.2d 266, 273, 660 N.Y.S.2d 371, 682 N.E.2d 972.

Some courts in New York have found that a fiduciary duty may be created even in certain arm's-length associations, but generally, an active attempt by the insurance company to create this closer relationship is required. *See Dornberger v. Metropolitan Life Ins. Co.*, 961 F.Supp. 506 (S.D.N.Y.1997) (finding that where MetLife reached out to Americans in Europe, actively assuaged their concerns about taxes, addressed questions about the relationship between American and foreign law, and promised personalized service to handle questions and problems, enough of a fiduciary relationship was alleged to pose the question to a jury); *see also Meagher v. Metropolitan Life Ins. Co.*, 119 Misc.2d 615, 463 N.Y.S.2d 727 (N.Y.Sup.1983) (finding that where 80–year old decedent who was in poor health at the time she purchased an annuity was told by defendant broker specifically that the annuity was a good investment for her and "would produce the largest return possible on her investment," that a claim of fiduciary duty survived a motion to dismiss). "Undoubtedly, there are instances where a fiduciary relationship springs into existence as a result of the dealings between an insurer and its insured. But those instances are the exception rather than the rule." *Rabouin v. Metropolitan Life Ins. Co.*, 182 Misc.2d 632, 699 N.Y.S.2d 655, 657 (N.Y.Sup.Ct.1999) (citations omitted). Furthermore, in cases that involve the purchase of annuities from insurance companies, "an annuitant purchasing a straight life annuity is presumed to know that they may die before receiving substantial benefits under the annuity contracts. Indeed, the annuitant assumes the risk of dying

before even the first benefit payment is made." *Sipes v. Equitable Life Assurance Society of the United States,* 1996 WL 507308, *4, 1996 U.S. Dist. LEXIS 12325, *12 (N.D.Cal., Aug. 13, 1996) (citations omitted) (finding, with facts remarkably similar to those in the instant case, but applying California law, that an insurer's fiduciary duties are limited to those found in the insurance contract, and "[a]n insurer does not have the duty to advise the insured on the adequacy of its coverage limits; strong public policy considerations militate against such a requirement, as it would turn the insurer into a personal financial counselor for the insured.") (quotations and citations omitted).

Defendants contend that the relationship that existed between TIAA and Decedent was one of a consumer and insurer that involved mere arm-length transactions and not one that involved a special relationship of trust or confidence. (Defendants' Mem. at 10). Plaintiff alleges that Defendants assumed a fiduciary duty by representing that they provide advice, guidance, and counseling to their plan participants, and that there was a showing of trust and confidence in Defendants by Decedent. (Compl.¶ 18). Plaintiff also alleges that even if Defendants were not obligated to provide Decedent with investment advice, they assumed a duty to act non-negligently by offering advice and the use of counselors, and by distributing the booklet, "Your Service Directory." (Pl.'s Mem. at 15–16.) Plaintiff cites cases that she construes as similar to the instant case for the proposition that Defendants assumed a duty of care to Decedent. (Pl.'s Mem. at 16–20.)

█ Conclusory allegations of "trust and confidence" are insufficient to support a successful claim of a fiduciary relationship. *See Abercrombie,* 438 F.Supp.2d at 274–75 (citing cases). The information provided to the plaintiff in *Shea v. Teacher's Retirement System,* cited by Plaintiff,

was clearly misleading—the provision in question indicated that a pension remained effective after the member's death—and the decedent relied on the erroneous information to select a retirement option that was entirely inferior to what she presumably thought she was choosing. 51 A.D.2d 345, 381 N.Y.S.2d 266, 270 (N.Y.App. Div. 1st Dep't 1976) (stating that the information provided to plaintiff "was both inadequate and misleading with regard to its effective scope."). The Court in *Leonelli v. Pennwalt Corp.,* also cited by Plaintiff, where defendant employer informed plaintiff employee that he had only two options, when in fact there was a third, and superior option available, found that the defendant had assumed a duty because it undertook an affirmative act that the plaintiff relied on, and which harmed him. 740 F.Supp. 122, 126 (N.D.N.Y.1990). In *Gediman v. Anheuser Busch, Inc.,* also cited by Plaintiff, the president of a company responded to a long letter written to him by the disabled plaintiff employee, who specifically asked the president for help in making a decision about his pension, because he was unqualified and ill-equipped to make the decision himself. 299 F.2d 537, 540 (2d Cir.1962). The court there found that by writing the letter, plaintiff had "placed himself in defendant's hands" and once defendant took it upon himself to advise him, he "was bound to advise clearly." Id. at 546.

█ Plaintiff here does not allege that the benefits information disseminated to Decedent was inaccurate, or that Defendants took a special interest in Decedent or promised her preferential treatment, or purposefully lulled her into making the decision to purchase the annuity she did. Plaintiff also does not allege that Decedent placed herself in Defendants hands, or proactively sought specific guidance about her decisions. Here, Decedent repeatedly sent letters informing Defendants as to what she wanted to do with her retirement

funds—including converting her original retirement annuities from Harvard and University of Michigan to a transfer payout annuity—and she asked numerous questions, implying a reasonable if not sophisticated level of understanding and belying the argument that she surrendered to the investment acumen of Defendants. Although she was 70 years old and in poor health, there is nothing to indicate that Decedent, who had a PhD and was a professor at prestigious academic institutions for 30 years—indeed, she was still teaching at the time she selected the annuity—was incapable of understanding the repercussions of her actions, or too incapacitated to engage in arm's-length contractual negotiations.

The Court finds that no fiduciary duty existed between Defendants and Decedent, and no such relationship was created by the circumstances of this particular case. Accordingly, Defendants' motion to dismiss the fiduciary claim is GRANTED.

### E. Negligence

Defendants argue that Plaintiff's negligence claim should be dismissed because Plaintiff cannot make out the elements required, namely that they owed a duty to Decedent. (Defendants' Mem. at 10).

"Under New York law ... a plaintiff must establish three elements to prevail on a negligence claim: '(1) the existence of a duty on defendant's part as to [sic] plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof.' " *Alfaro v. Wal–Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir.2000) (quoting *Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325, 333, 441 N.Y.S.2d 644, 424 N.E.2d 531 (N.Y.1981)). Plaintiff bases her negligence claim on the following: "By offering investment advice and guidance, defendants created a duty for themselves which they had to discharge in a non-negligent manner." (Pl.'s Mem. at 10.)

As previously discussed, the Court finds that Defendants owed no duty to Decedent to ensure that she was making the best decision she could when she purchased her life annuity, therefore, the negligence claim fails as a matter of law. Defendants' motion to dismiss the negligence claim is GRANTED.

### F. Remaining Arguments

Defendant also contends that Plaintiffs' claims under Section 10(b) of the Exchange Act of 1934 and Rule 10b–5 are time-barred, and that Plaintiff's claim for punitive damages and attorney's fees should be struck. Because the Court dismisses all the claims in the Complaint, it does not analyze these arguments.

### III. CONCLUSION

For all the foregoing reasons, Defendants' motion to dismiss is GRANTED. The clerk of the court is directed to close this case.

SO ORDERED.