**SOLUTIA INC., Plaintiff,**

v.

**FMC CORPORATION, Defendant.**

**No. 04 Civ. 3842(WHP).**

United States District Court,
S.D. New York.

July 31, 2006.

Order Denying Reconsideration
Nov. 7, 2006.

Barbara B. Edelman, Esq., Mindy Barfield, Esq., Dinsmore & Shohl LLP, Lexington, KY, for Plaintiff.

Ann B. Laupheimer, Esq., Jeremy A. Rist, Esq., Blank Rome LLP, Philadelphia, PA, Craig A. Damast, Esq., Rocco A. Cavaliere, Esq., Blank Rome LLP, New York City, for Defendant.

## MEMORANDUM AND ORDER

PAULEY, District Judge.

Solutia Inc. ("Solutia") brings this action against FMC Corporation ("FMC") alleging, *inter alia*, claims for breach of contract, breach of fiduciary duty, negligent misrepresentation and fraud in connection with the parties' joint venture, an entity known as Astaris, LLC ("Astaris"). Solutia moves for partial summary judgment pursuant to Fed.R.Civ.P. 56. FMC moves for summary judgment on all claims or, in the alternative, to strike Solutia's demand for a jury trial. For the reasons discussed below, Solutia's motion for partial summary judgment is granted in part and denied in part, FMC's motion for summary judgment is granted in part and denied in part, and FMC's motion to strike Solutia's jury demand is granted.

### BACKGROUND

I. *Procedural History*

Solutia filed suit against FMC in Missouri state court on October 16, 2003. Thereafter, Solutia filed for bankruptcy in the Southern District of New York. On February 20, 2004, Solutia filed this action in the bankruptcy court and voluntarily dismissed the Missouri action. On FMC's motion, this Court withdrew the reference from the bankruptcy court and assumed jurisdiction over this action. *See Solutia Inc. v. FMC Corp.*, No. 04 Civ. 2842(WHP), 2004 WL 1661115 (S.D.N.Y. July 27, 2004).

In its Complaint, Solutia asserted claims for breach of Section 6.4 of the Joint Venture Agreement between Solutia and FMC dated April 29, 1999 (the "JVA"), breach of the Assignment of PPA Technology Agreement executed by FMC and an Astaris subsidiary on April 1, 2000, and breach of the Asset Transfer Agreement entered into by FMC, Astaris and various of their subsidiaries on April 1, 2000. On March 29, 2005, this Court granted FMC's motion to dismiss those breach of contract claims on the grounds that Solutia lacked standing to sue for damages suffered by Astaris. *See Solutia, Inc. v. FMC Corp.*, 385

F.Supp.2d 324 (S.D.N.Y.2005). The Court denied FMC's motion to dismiss Solutia's claims for breach of Section 17.1 of the JVA, breach of fiduciary duty, negligent misrepresentation and fraud.

## II. *Negotiation of the Joint Venture*

This action arises out of a failed joint venture between Solutia and FMC for the production of purified phosphoric acid ("PPA") at a plant in Conda, Idaho (the "Conda Plant"). PPA is an ingredient in many foodstuffs and also has myriad agricultural and industrial applications. Solutia and FMC are publicly-traded corporations that produce chemicals for industrial and consumer use. Prior to their joint venture, both parties were engaged in the manufacture and sale of phosphorus chemical products and competed with each other in various segments of the North American market. (Solutia's Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 ("Pl.'s 56.1 Stmt.") ¶ 1; FMC's Counterstatement of Material Facts on Summary Judgment in Opposition to Solutia's Motion for Partial Summary Judgment ("Def.'s 56.1 Counterstmt.") ¶ 1; FMC's Statement of Material Facts on Summary Judgment Pursuant to Local Rule 56.1 ("Def.'s 56.1 Stmt.") ¶ 8.)

In May 1998, representatives of Solutia and FMC met to discuss the possibility of a joint venture for the production of PPA. (Pl.'s 56.1 Stmt. ¶ 9; Def.'s 56.1 Counterstmt. ¶ 9.) At that time, both parties produced PPA through the traditional "thermal process" method, the details of which are irrelevant to these motions. (Def.'s 56.1 Stmt. ¶ 6; Solutia's Response to FMC's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("Pl.'s 56.1 Counterstmt.") ¶ 6.) FMC's subsidiary in Spain also manufactured PPA through a less expensive and more efficient "wet process" method. While Solutia did not utilize the wet process method at any of its production facilities, it was part of a Brazilian joint venture where PPA was manufactured through a wet process. (Def.'s 56.1 Stmt. ¶ 7; Pl.'s 56.1 Counterstmt. ¶ 7.) The parties jointly represented to the Federal Trade Commission ("FTC") that Solutia lacked the technology and infrastructure to produce PPA through a wet process method. (Pl.'s 56.1 Counterstmt. ¶ 7; The FMC/Solutia Joint Venture Will Expand Output, Lower Costs and Enhance Competition in the Phosphorus Chemicals Business (Ex. 53).) [1]

On November 18, 1998, the parties executed a letter agreement drafted by Solutia governing continued exploration of a transaction between Solutia and FMC (the "Letter Agreement"). (Def.'s 56.1 Stmt. ¶ 16; Pl.'s 56.1 Counterstmt. ¶ 16.) The Letter Agreement provided that neither party was required to reach any agreement, nor disclose proprietary information:

> Neither party shall have any obligation to commence or continue discussions or negotiations, to provide any of its Confidential Information to the other party or to receive any Confidential Information from the other party, to reach or exe-

---

**1.** All citations to numbered exhibits refer to items attached to the Declaration of Barbara B. Edelman in Support of Plaintiff's Motion for Partial Summary Judgment dated October 18, 2005 and the Second Declaration of Barbara B. Edelman dated November 15, 2005; all citations to lettered exhibits refer to items attached to the Declaration of Jeremy A. Rist Certifying the Authenticity of Exhibits Supporting Defendant FMC Corporation's Motion for Summary Judgment dated October 18, 2005 and the Declaration of Jeremy A. Rist Certifying the Authenticity of Exhibits Supporting Defendant FMC Corporation's Memorandum in Opposition to Solutia Inc.'s Motion for Partial Summary Judgment dated November 15, 2005.

cute any agreement with the other party, to refrain from engaging at any time in any business whatsoever, or to refrain from entering into or continuing any discussions, negotiations and/or agreements at any time with any third party, until a formal written contract is executed as provided in the first sentence of paragraph 4 hereof.

(Letter Agreement, § 3 (Ex. X).) The Letter Agreement further provided that any representations or warranties had to be in a "formal written definitive contract" executed by the parties:

> Except for the matters set forth in this letter, neither [FMC] nor Solutia shall be committed or liable in any way with respect to the possible transaction or the matters discussed unless and until a formal written definitive contract with respect thereto is executed by appropriate representatives or officers of both parties pursuant to due authorization or subject to due ratification by their respective Boards of Directors.... Nothing contained in any discussions between the parties or in any information disclosed by either party as contemplated by this letter shall be deemed to constitute a representation or warranty. Except for the matters expressly specified in this letter or in [the contemplated] formal written definitive contract, neither party shall be entitled to rely on any statement, promise, agreement or understanding, whether oral or written, or any custom, usage of trade, course of dealing or conduct in connection with the Possible Transaction.

(Letter Agreement, § 4.) The parties also agreed to the following merger clause:

> This letter is the complete and exclusive statement by [FMC] and Solutia of their understanding in connection with all matters pertaining to the possible transaction and supersedes all previous or contemporaneous dealings, agreements and understandings with respect thereto.

(Letter Agreement, § 11.)

After executing the Letter Agreement, the parties' representatives met on at least thirteen different occasions to discuss a potential joint venture. (Pl.'s 56.1 Stmt. ¶ 11; Def.'s 56.1 Counterstmt. ¶ 11.) During these discussions, it is undisputed that each party was represented by both in-house counsel and outside law firms (FMC by Dechert LLP and Solutia by Lewis Rice & Fingersh). (Def.'s 56.1 Stmt. ¶ 18.) However, the extent to which the negotiations focused on FMC's PPA wet process technology is disputed. (*See, e.g.,* Pl.'s 56.1 Stmt. ¶¶ 12–13; Def.'s 56.1 Counterstmt. ¶¶ 12–13.) According to Solutia, FMC's PPA technology was "[t]he most critical contribution to the deal" and it "repeatedly asked for as much information as FMC would divulge concerning its PPA technology." (Pl.'s 56.1 Stmt. ¶¶ 12–13). FMC disputes this and claims its PPA technology was "not Solutia's primary concern in the negotiations." (Def.'s 56.1 Counterstmt. ¶¶ 12–13.) In any event, the parties agree that at least "generally," FMC was unwilling to provide Solutia with details about its PPA technology because the parties were competitors, and witnesses from both sides testified that this technology is normally kept secret to prevent the loss of competitive advantage. (Pl.'s 56.1 Stmt. ¶ 18; Def.'s 5 6. 1 Counterstmt. ¶¶ 18, 70–71; Pasquier Deposition Transcript at 146–147 (Ex. J); Wulfert Deposition Transcript at 19–21 (Ex. O).) Solutia was fully aware that FMC possessed information on its PPA technology that it was refusing to disclose. (Pl.'s 56.1 Stmt. ¶ 18.)

Despite a general unwillingness to share information concerning its PPA technology, it appears that FMC made a number of

disclosures and representations about the wet process during negotiations over the joint venture. In particular:

· Michael Miller, a Solutia executive, testified that based on a "conversation with Bill Beck [an FMC executive], and what I knew from industry sources, publications, public record, that FMC ... operated a purified wet acid plant in Spain ... And I think Bill characterized to me that they had purified wet acid technology on the shelf, ready to go, and that they could, with a certain degree of capital, be in the purified wet acid business in the United States." (Miller Deposition Transcript, at 147:13–148:3 (Ex. 7).)

· Contemporaneous notes of Kenneth Wulford, a Solutia employee, reflect that on December 22, 1998 FMC represented its PPA technology "[c]an do [i.e., produce] all food grade [PPA]." (Wulford Deposition Transcript, at 182:10–11 (Ex. 13).)

· On February 19, 1999 an FMC employee, Eddie Goldberg, narrated a Power Point presentation to Solutia representatives that included certain information about the history of FMC's PPA technology and its processes. (Power Point Presentation (Ex. 14).) However, the precise meaning and significance of the disclosures in this presentation are disputed. (Pl.'s 56.1 Stmt. ¶¶ 15–16; Def.'s 56.1 Counterstmt. ¶¶ 15–16.)

· Notes taken by Solutia employee Frank Reining in February 1999 state the Conda Plant would be able to produce "all food grade acid" if desired and that it would be "the best acid plant in the world." (Reining Deposition Transcript, at 236:20, 239:15–17 (Ex. 11).) Whether these comments were made by FMC or merely reflect Solutia's subjective understanding is disputed. (Pl.'s 56.1 Stmt. ¶ 17; Def.'s 56.1 Counterstmt. ¶ 17.)

· On April 14, 1999 FMC provided Solutia with several pages containing information regarding FMC's PPA technology. (Letter dated April 14, 1999 and Attached Documents (Ex. 18).) The cover letter for these documents provided that the materials were not to be used for any purpose "other than evaluating its position in the Joint Venture" and further stated: "The agreements set forth in this letter shall be consistent with the terms and conditions of the November 18, 1998 confidentiality agreement between the parties and shall not be intended to expand or limit such terms and conditions." (Letter dated April 14, 1999 and Attached Documents (Ex. 18).)

### III. *The Joint Venture Agreement*

On April 29, 1999 the parties executed the JVA. (Pl.'s 56.1 Stmt. ¶ 20; Def.'s 56.1 Counterstmt. ¶ 20.) As discussed below, the parties' use of the title "Joint Venture Agreement" is a misnomer. The JVA provided that the parties would "negotiate exclusively in good faith" toward the formation of a joint venture of their phosphorus chemicals businesses.

More specifically, Section 2.1 provided, in relevant part:

Subject to the terms and conditions stated in this Agreement ... the parties shall take all such steps and do all such things as are reasonably necessary to create between the FMC Group and the Solutia Group a worldwide joint venture capable of operating as an autonomous commercial entity.... In conjunction with the foregoing, from the date hereof until the date this Agreement is terminated, Solutia and FMC will negotiate exclusively in good faith with each other for the formation of a joint venture of

their Phosphorus Chemicals business (and the transfer of each of its respective Phosphorus Chemicals business), and will not discuss with any third parties any other joint venture, sale, disposition or combination of its respective Phosphorus Chemicals business that is subject to terms of this Agreement and will not encourage or solicit any inquiries or proposals by, or engage in any discussions or negotiations with, or except as required by any governmental authority or applicable law, rule or regulation, furnish any nonpublic information to, any person, concerning a joint venture, sale, combination or other disposition of its Phosphorus Chemicals business.

(JVA, § 2.1 (Ex. P).) The JVA further stated:

> The parties intend that the transfer of the Transferred Assets to the Joint Venture and the other various transactions, transfers, contributions and agreements to be made or entered by and between the Solutia Group or the FMC Group and the Joint Venture in connection with the formation of the Joint Venture, *shall be effective on the Effective Date.*

(JVA, § 2.3 (emphasis added).) Section 1.25 of the JVA defines "Joint Venture" as "the joint venture to be formed between the FMC Group and the Solutia Group in accordance with the principles set out in this Agreement [i.e., Astaris]...." (JVA § 1.25.) The "Effective Date" is defined as "12:01 a.m. on a date that the parties may mutually agree in writing...." (JVA § 1.10.)

In addition, the JVA contemplated the structure of the joint venture. For example, the JVA specified that the joint venture would be created as a Delaware limited liability company ("LLC") and that each party would "have a direct or indirect fifty percent (50%) interest" in the LLC, with "control ... shared equally between the parties." (JVA §§ 2.2, 5.1.) The specific mechanisms for supervision and management of the joint venture were set out in detail, including, *inter alia,* the size of the LLC's board of directors, the board's voting procedures and its areas of responsibility, the means of appointing managers, and the areas of management responsibility. (*See, e.g.,* JVA §§ 10, 11.) The JVA also provided that "[t]he parties shall share all profits and losses earned or incurred by the Joint Venture in equal shares," and set forth each party's contribution to the joint venture. (JVA §§ 5.2, 6.1, 6.2, 6.3, 6.4.)

At the time the parties executed the JVA, Solutia was fully aware that FMC was refusing to disclose information regarding its PPA technology. Nonetheless, both Solutia and FMC made a number of representations and warranties in the JVA, including that each "ha[d] disclosed to the other party all material facts and circumstances existing on the date hereof which could reasonably be likely to, in such party's commercially reasonable judgment, have a material adverse effect on the Joint Venture." (JVA § 16. 1.) The parties also agreed that "[u]ntil the Effective Date, each party shall continue to use its reasonable efforts to allow the other party to continue due diligence of such party's Phosphorus Chemicals business." (JVA § 23.7.)

> Similar to the Letter Agreement, the JVA contained a merger clause:

> This Agreement, including the Appendices attached to this Agreement and the Recitals set forth herein, constitutes the entire agreement between the parties pertaining to the subject matter hereof, and all prior representations, discussions and negotiations between the parties and/or members of their Groups pertaining to the subject matter of this Agree-

ment are superseded. Notwithstanding the preceding sentence, the terms and provisions of the [Letter Agreement] between the parties shall remain in full force and effect.

(JVA, § 23.4.) The JVA further provided:

In the event of any conflict or inconsistency between the provisions of this Agreement and any other document related to the subject matter of this Agreement, which may be entered into by the parties or between a member of any Group and the Joint Venture, from time to time, the provisions of this Agreement shall prevail in each case, unless the parties otherwise expressly agree in writing.

(JVA § 23.9.)

Finally, the parties agreed that "[t]he obligation of each party to consummate the Joint Venture is subject to the satisfaction (or waiver) on the Effective Date of" three conditions: (1) government approval pursuant to the Hart–Scott–Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"); (2) other necessary government approvals; and (3) approval by the boards of directors of both Solutia and FMC. (JVA, § 17.1.) A party could terminate the JVA before the Effective Date only in the event that (1) a court, arbitrator, or governmental, regulatory or administrative body issued an order restraining or prohibiting the transaction; (2) a "bona fide claim or litigation involving, directly or indirectly, one or both of the parties" had arisen, which could reasonably have been expected to materially and adversely affect the business prospects of the joint venture; or (3) a material adverse change reasonably outside of the control of the party seeking to terminate occurred with respect to the assets to be contributed by the non-terminating party. (JVA, § 17.2.) The parties contemplated that the Effective Date would be set on or before De-

cember 31, 1999, and their respective termination rights under Section 17 expired on that date. (JVA, § 17.3.)

Solutia alleges that after the parties executed the JVA, FMC unlawfully failed to disclose significant documents and information concerning its PPA technology. In particular, Solutia claims FMC failed to disclose:

· A memorandum by Henry Pfeffer dated June 29, 1999 entitled "Summary Report of the PPA Technology Review" (the "Pfeffer Report") summarizing and supplementing discussions held by FMC personnel on May 3–4, 1999. (Pfeffer Report (Ex. 32).) The Pfeffer Report's stated purpose was to "identify any remaining uncertainties that must be addressed before the [Conda] [P]lant design is finalized," and the report detailed numerous process uncertainties, including several that *"pose[d] a risk to the success of the PPA venture."* (Pfeffer Report at 1, 4 (emphasis in original).)

· An internal e-mail from Jerry Sibley of FMC (the individual chosen to head Astaris) dated June 21, 1999 instructing his technology team to "search the world over to locate and/or determine organics removal technology" and stating that "[w]e need a technology development plan with timing and resources required to solve this problem. 'Trust me, we'll find a solution' just won't work." (E-mail from Jerry Sibley dated June 21, 1999 (Ex. 35).)

· A September 1999 PPA Project Status Report identifying various technology issues and uncertainties.

· A memorandum dated February 28, 2000, entitled "Preliminary PPA Technology Development Plan," which addressed "critical open technology issues." (February 28, 2000 Memorandum, at 1 (Ex. 28).)

· A variety of other documentation concerning FMC's reviews, studies and communications regarding its PPA technology from the period April 1999 through April 2000. (Collection of Documents (Ex. 39).)

For its part, FMC asserts that Jerry Sibley disclosed the substance, if not the details, of the technology uncertainties reflected in each of these documents in the course of numerous conversations he had with Dennis Cavner and Frances Reining of Solutia after the execution of the JVA. According to FMC, Sibley's disclosures of these wet process uncertainties are reflected in Cavner's and Reining's contemporaneous handwritten notes. (Cavner Notes (Ex. EE); Reining Notes E-mail from Dennis Cavner dated July 9, 1999 (Ex. KKK); Reining Notes (Ex. FF).)

## IV. Creation of Astaris

Although the parties differ in their characterizations of events, it is undisputed that after the execution of the JVA they took significant steps in furtherance of the establishment of Astaris. For example, the parties chose certain officers, leased office space for the company, and held meetings in anticipation of its formation. (Pl.'s 56.1 Stmt. ¶¶ 25–30; Def.'s 56.1 Counterstmt. ¶¶ 25–30.)

On December 29, 1999 the parties executed a First Amendment to the JVA extending their termination rights under Section 17 until February 10, 2000. (First Amendment to the JVA, § 2 (Ex. GG).) The parties executed a Second Amendment on February 9, 2000, which extended their termination rights through March 31, 2000. (Second Amendment to the JVA, § 2 (Ex. HH).)

On February 25, 2000, the parties agreed to the terms of a Consent Order pursuant to which the FTC would recommend approval of the joint venture. (Pl.'s 56.1 Stmt. ¶ 23; Def.'s 56.1 Counterstmt. ¶ 23.) On March 31, 2000 the parties executed a Third Amendment to the JVA pursuant to which the JVA's Effective Date was set on April 1, 2000. (Third Amendment to the JVA, § 2 (Ex. II).) The FTC provisionally approved the transaction on April 7, 2000 and the parties appear to have staged what Solutia calls a "closing" and FMC terms a "formation meeting" for Astaris on or about April 12, 2000. (Pl.'s 56.1 Stmt. ¶ 24; Def.'s 56.1 Counterstmt. ¶ 24.)

Solutia alleges that Astaris' Conda Plant performed well below expectations and produced low-grade PPA, making the venture a commercial failure. (Complaint ¶ 26.) In 2003, Astaris sold the Conda Plant. (Def.'s 56.1 Counterstmt. ¶ 118.) In November 2005, the parties liquidated Astaris' remaining assets. (Def.'s 56.1 Counterstmt. ¶ 117.)

## DISCUSSION

### I. Standard for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); Grady v. Affiliated Cent., Inc., 130 F.3d 553, 559 (2d Cir.1997). In determining whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is

to be believed, and all justifiable inferences are to be drawn in [its] favor." *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505.

Where a motion for summary judgment presents conflicting interpretations of contractual language, the court must decide as a matter of law whether the language is ambiguous. *Mellon Bank, N.A. v. United Bank Corp. of New York,* 31 F.3d 113, 115 (2d Cir.1994). The court must "make[ ] this determination by reference to the contract alone," *Burger King Corp. v. Horn & Hardart Co.,* 893 F.2d 525, 527 (2d Cir. 1990), and interpret it "to effect the general purpose of the contract," *Postlewaite v. McGraw–Hill, Inc.,* 411 F.3d 63, 67 (2d Cir.2005). *See also Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d 1091, 1095 (2d Cir.1993).

Where the contractual language in dispute is ambiguous and "there is also relevant extrinsic evidence of the parties' actual intent, the meaning of the provisions becomes an issue of fact barring summary judgment." *Williams & Sons Erectors, Inc. v. S.C. Steel Corp.,* 983 F.2d 1176, 1183 (2d Cir.1993). However, "[a]mbiguity without the existence of extrinsic evidence of intent presents not an issue of fact, but an issue of law for the court to rule on." *Williams & Sons,* 983 F.2d at 1184; *accord Aetna Cas. & Sur. Co. v. Aniero Concrete Co.,* 404 F.3d 566, 598 (2d Cir. 2005); *Revson v. Cinque & Cinque, P.C.,* 221 F.3d 59, 66 (2d Cir.2000). Similarly, "if the language of the contract is 'wholly unambiguous,'" the proper interpretation of the contract becomes a question of law appropriate for summary judgment. *Mellon Bank,* 31 F.3d at 115 (quoting *Wards Co. v. Stamford Ridgeway Assocs.,* 761 F.2d 117, 120 (2d Cir.1985)).

## II. *Claims and Defenses*

FMC moves for summary judgment on Solutia's remaining claims. Solutia moves for partial summary judgment on the issue of whether FMC owed a duty of full disclosure as of April 29, 1999 and if so, whether FMC breached such duty. Solutia also seeks dismissal of FMC's Eleventh Affirmative Defense (which asserts that Solutia's knowledge of wet process PPA technology imposed a duty of inquiry that precluded reasonable reliance on any omissions) and FMC's Twelfth Affirmative Defense (which asserts contributory or comparative negligence).

### A. *Solutia's Breach of Contract Claim*

Solutia claims that FMC breached Section 16.1 of the JVA, which provides, in relevant part: "Each party represents and warrants to the other party that ... (v) it has disclosed to the other party all material facts and circumstances *existing on the date hereof* which could reasonably be likely to, in such party's commercially reasonable judgment, have a material adverse effect on the joint venture." JVA § 16.1 (emphasis added). FMC argues that it is entitled to summary judgment on this claim because, even if it "misrepresented or omitted information prior to the signing of the JVA, it is undisputed that FMC thereafter disclosed information ... that superseded, or 'cured' the alleged, pre-JVA misrepresentations or omissions."

To sustain a claim for breach of contract under Section 16.1 of the JVA, Solutia must demonstrate: (1) the existence of an express warranty; (2) material breach of the warranty; (3) damages proximately resulting from the material breach; and (4) justifiable reliance on the warranty. *Metromedia Co. v. Fugazy, et al.,* 983 F.2d 350, 360 (2d Cir.1992). To prevail on summary judgment, FMC must show that Solutia has not adduced evidence sufficient for a reasonable person to find at least one of these four elements. FMC argues that

Solutia has not met its burden to establish either material breach or causation.

As an initial matter, whether a particular non-disclosure could, in a "party's commercially reasonable judgment, have a material adverse effect on the joint venture" is a question inherently difficult to resolve on summary judgment because it requires an assessment of all the facts and circumstances surrounding the situation. *See Merrill Lynch v. Allegheny Energy, Inc.*, No. 02 Civ. 7689(HB), 2005 WL 832050, at *6 (finding in the context of a similar warranty that "proof of reasonable judgment and good faith negates summary judgment").

Even assuming, however, that FMC's alleged non-disclosures constitute material breaches, FMC argues that it cured those non-disclosures in a timely fashion. In particular, FMC argues that the handwritten notes of Cavner and Reining, produced in discovery, prove that it cured any material non-disclosures by August 1999, leaving Solutia sufficient time to terminate the JVA and prevent the formation of the joint venture. This Court disagrees.

First, FMC did not question Cavner and Reining about their notes during discovery, which is significant in view of both witnesses' testimony that they believed FMC had not disclosed any major problems with its PPA technology. The true construction of the notes is therefore a question of fact requiring trial.

Second, the universe of non-disclosures claimed by Solutia after the completion of discovery is more expansive than that alleged in the Complaint. Thus, absent a presentation by Solutia of all of the facts giving rise to the alleged breaches by FMC, it is impossible for this Court to determine whether FMC's alleged disclosures were sufficient to cure any breach.

FMC also argues that even if Solutia is correct about the alleged breaches, as a matter of law it is still entitled to summary judgment because Solutia cannot demonstrate any damages. Specifically, FMC contends that (1) Solutia learned all material facts from FMC in time to terminate the JVA, but failed to do so; and (2) as a consequence, Solutia cannot establish that any breach proximately caused damages concerning the formation of the joint venture in April 2000. As discussed above, there is a factual dispute regarding the extent and sufficiency of FMC's purported curative disclosures, which precludes summary judgment.

### B. Solutia's Breach of Fiduciary Duty Claim

Solutia's claim for breach of fiduciary duty is premised on three essential arguments. First, Solutia contends that the parties were joint venturers as of the date the JVA was executed in April 1999 and as such, FMC owed Solutia a duty of full disclosure. Second, Solutia argues that it "reposed trust and confidence in FMC concerning the development of the PPA Technology for use at the Conda plant," which created a duty of full disclosure. Third, Solutia submits that because FMC had "superior knowledge about its PPA Technology" it was under a duty to disclose all material information and Solutia was entitled to rely on its representations and omissions.

#### 1. Duties of Joint Venturers

The initial question for this Court is whether, and if so when, the parties entered into a joint venture that gave rise to fiduciary obligations. "Joint adventurers ... owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those

acting at arm's length, are forbidden to those bound by fiduciary ties.... Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." *Meinhard v. Salmon,* 249 N.Y. 458, 463–64, 164 N.E. 545 (1928). Solutia argues that the execution of the JVA in April 1999 immediately created a joint venture between the parties.[2] FMC counters that the JVA was a mere "agreement to agree" under New York law, which by definition could not bind the parties to create a joint venture. This Court must determine whether the JVA was binding on the parties as of the date of its execution and, if so, to what extent.

■ "Ordinarily, where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract." *Brown v. Cara,* 420 F.3d 148, 153 (2d Cir.2005). "In some circumstances, however, preliminary agreements can create binding obligations." *Adjustrite Systems, Inc. v. GAB Bus. Servs., Inc.,* 145 F.3d 543, 548 (2d Cir.1998). "The extent of the obligations created depend on the preliminary agreement in question, though, in general, 'binding preliminary agreements fall into one of two categories.'" *Brown,* 420 F.3d at 153 (quoting *Adjustrite,* 145 F.3d at 548). The first type reflects a meeting of the minds on "all the issues perceived to require negotiation." *Teachers Ins. & Annuity Ass'n v. Tribune Co.,* 670 F.Supp. 491, 498 (S.D.N.Y.1987). Because it is "complete," this type of preliminary agreement "binds both sides to their ultimate contractual objective." *Adjustrite,* 145 F.3d at 548.

■ By contrast, the second type of preliminary agreement is "binding only to a certain degree," reflecting agreement "on certain major terms, but leav[ing] other terms open for further negotiation." *Adjustrite,* 145 F.3d at 548. This type of agreement "does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the ... objective within the agreed framework." If the parties "fail to reach such a final agreement after making a good faith effort to do so, there is no further obligation." *Adjustrite,* 145 F.3d at 548.

■■ In determining the nature of a preliminary agreement, "[t]he key, of course, is the intent of the parties: whether the parties intended to be bound, and if so, to what extent." *Adjustrite,* 145 F.3d at 548. To discern that intent, "a court must look to the words and deeds [of the parties] which constitute objective signs in a given set of circumstances." *Adjustrite,* 145 F.3d at 549 (internal quotations and citations omitted). Courts must consider the following four factors in determining whether a preliminary agreement is enforceable as to the "ultimate contractual objective:" (1) whether there is an expressed reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the

---

**2.** Solutia asserts that this Court "has already ruled that FMC's fiduciary duty of full disclosure existed as of April 1999." This argument is unavailing. The Court's inquiry on a motion to dismiss is different than it is on summary judgment. *Compare* Fed.R.Civ.P. 12 *with* Fed.R.Civ.P. 56; *see also Boley v. Pineloch Assocs.,* 700 F.Supp. 673, 680–81 (S.D.N.Y.1988) ("Usually ... a claim alleging the existence of a fiduciary duty is not subject to dismissal in a 12(b)(6) motion, given the generous pleading standard established in Fed.R.Civ.P. 8."); *see also RCR Builders, Inc. v. Batex Contracting Corp.,* 230 A.D.2d 897, 898, 646 N.Y.S.2d 713, 714 (2d Dep't 1996) ("Generally, the issue of the existence of a joint venture presents a question of fact.").

terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to a writing. *Brown,* 420 F.3d at 154.

First, the JVA provided that the parties' obligations *in respect of the ultimate contractual objective* would be conditioned on future approvals and on the occurrence of various conditions precedent. For example, JVA § 17.1 provided that "[t]he obligation of each party to consummate the Joint Venture" was "subject to" the issuance of various government approvals and approval by the boards of directors of both Solutia and FMC. The JVA also provided that each party could pursue due diligence until the Effective Date and terminate the JVA in the event it discovered a "material adverse change reasonably outside of [its] control" with respect to the assets to be contributed to the joint venture by the non-terminating party. (JVA, § 17.1.) Collectively, these provisions amount to an "expressed reservation of the right not to be bound" to the formation of a joint venture. *See Adjustrite,* 145 F.3d at 548 ("[W]here an agreement contains open terms, calls for future approval, and expressly anticipates future preparation and execution of contract documents, there is a strong presumption against finding a binding and enforceable obligation."). By contrast, sections of the JVA concerning the duties of both parties in respect of ongoing negotiations toward formation of a joint venture were expressly intended to bind the parties immediately upon execution of the agreement. For example, JVA § 2.1 required both parties to negotiate in good faith "from the date hereof until this Agreement is terminated" for the creation of a joint venture; JVA § 16.1 warranted that "this Agreement has been duly executed, and constitutes the legal, valid and binding obligation of ... [each] party, enforceable against ... [each] party in accordance with its terms;" and JVA § 18 required that the assets to be contributed to the contemplated joint venture vehicle be operated consistently with past business practices until their actual contribution.

As to the second factor, while the parties partially performed under the JVA by continuing to negotiate the creation of the joint venture vehicle after execution, neither party performed any of its formation obligations. Thus, neither party contributed property or knowledge until the Effective Date.

With respect to the third factor, the JVA contained significant open terms and specifically contemplated further negotiations between the parties. *See, e.g.,* JVA § 2.1 (Ex. 10) ("[F]rom the date hereof until the date this Agreement is terminated, Solutia and FMC will negotiate exclusively in good faith with each other for the formation of a joint venture of their Phosphorus Chemicals business."); JVA § 5 (Ex. 10) (providing that the parties were to "agree on a mechanism" to handle the tax treatment of the joint venture); JVA § 6.5 (providing that "[t]itle to the [assets to be transferred to the joint venture vehicle] shall be passed ... in accordance with Asset Transfer Agreements to be entered into by the Joint Venture and ... [FMC or Solutia], as the case may be").

Finally, this Court finds that Solutia and FMC were sophisticated parties that would not "usually" enter into joint venture agreements involving contributions of hundreds of millions of dollars without memorializing every element of their agreement in a writing. *Brown,* 420 F.3d at 154. To the extent the JVA deferred certain obligations, left open material terms or was subject to future approvals or conditions precedent, this Court concludes that the parties did not intend to bind themselves to the ultimate contractual ob-

jective. Rather, the JVA provided a framework within which the parties could continue to negotiate exclusively with each other, in good faith, for the formation of a joint venture.

■■■ Irrespective of whether the JVA was binding as to the eventual creation of a joint venture, Solutia argues that a joint venture was formed by the parties immediately on its execution. New York law requires five elements to create a joint venture: (1) two or more persons must enter into a specific agreement to carry on an enterprise for profit; (2) their agreement must evidence their intent to be joint venturers; (3) each must make a contribution of property, financing, skill, knowledge or effort; (4) each must have some degree of joint control over the venture; and (5) there must be a provision for the sharing of both profits and losses. *Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 67–68 (2d Cir.2003); *Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.*, 909 F.2d 698, 701 (2d Cir.1990). The ultimate inquiry in determining whether a joint venture exists is whether "the parties have so joined their property, interest, skills and risks that for the purposes of the particular adventure their respective contributions have become as one and the commingled property and interests of the parties have thereby been made subject to each of the associates on the trust and inducement that each would act for their joint benefit." *Indep. Energy Corp. v. Trigen Energy Corp.*, 944 F.Supp. 1184, 1201 (S.D.N.Y.1996) (citations omitted).

Solutia further argues that the terms of the JVA satisfied the *Dinaco* elements. The JVA was a specific agreement pursuant to which Solutia and FMC intended to carry on an enterprise for profit and it expressly stated the parties' intent to be joint venturers. Each party's contributions to the joint venture were specifically listed, the parties were to share equal control over the venture and all profits and losses were to be shared equally. Solutia asserts that these terms were sufficiently definite to create a joint venture relationship with attendant fiduciary duties immediately upon execution of the JVA. This Court disagrees.

■■■ As discussed above, at the time of its execution the JVA was not binding on the parties with respect to their "ultimate contractual objective." Moreover, even if the agreement was binding as to the ultimate formation of a joint venture, by its express terms the JVA did not create a joint venture under New York law until the Effective Date. *See* JVA § 2.1 (providing that all matters in connection with the formation of the joint venture "shall be effective on the Effective Date"); JVA § 2.3 (providing that each party's contribution of assets to the Joint Venture was to be effective only on the Effective Date, and the assets were not to be commingled until that date). "The mere fact that the parties anticipated a joint venture would eventually be created is insufficient" to create a joint venture, especially where "the specified conditions precedent to the formation of the joint venture were not satisfied." *Southwick Clothing LLC v. GFT (USA) Corp.*, No. 00 Civ. 10452(GBD), 2004 WL 2914093, at *10 (S.D.N.Y. Dec. 15, 2004).

Although Solutia attempts to distinguish *Southwick* on the ground that it applies Massachusetts and not New York law, Solutia offers no persuasive authority suggesting that New York law would lead to a different conclusion. Indeed, the elements necessary to create a joint venture appear to be very similar under Massachusetts and New York law. *See Shain Inv. Co. Inc. v. Cohen*, 15 Mass.App.Ct. 4, 443 N.E.2d 126, 130 (1982) (enumerating the

requirements for a joint venture under Massachusetts law).

Solutia cites *SCS Communications, Inc. v. The Herrick Co., Inc.*, 360 F.3d 329 (2d Cir.2004), *Precision Testing Labs., Ltd. v. Kenyon Corp. of Am.*, 644 F.Supp. 1327 (S.D.N.Y.1986) and *Richbell Info. Servs. v. Jupiter Partners*, 309 A.D.2d 288, 765 N.Y.S.2d 575 (1st Dept.2003) in support of its argument that a joint venture was formed immediately upon execution of the JVA. However, none of these cases involved a written agreement manifesting the parties' intention *not* to be bound except upon the occurrence of certain conditions precedent. *SCS* involved an agreement pursuant to which the defendants had agreed not to acquire a certain business without plaintiff's participation. In the drafting stage, the parties had deleted a provision in the agreement providing that no joint venture was to be created until the execution of a later, definitive agreement. When the parties failed to agree on the terms pursuant to which they would acquire the target business, defendants excluded plaintiff from the transaction and the court allowed plaintiff to maintain a joint venture claim. In a similar vein, *Precision* involved a situation where the plaintiff had already made his contribution to the alleged joint venture (in the form of technical expertise) by the time the defendant declared that no joint venture existed, and thus cannot be invoked for the proposition that parties need only contemplate making financial contributions in order to create a joint venture. And *Richbell* involved the pleading standard for a joint venture on a motion to dismiss, and is therefore inapplicable to the instant motion.

Solutia also contends that, even if the joint venture was not formed until April 2000, it was owed a fiduciary duty as of April 1999 because under New York law, fiduciary duties are owed between joint venturers at all stages of their relationship, including the period prior to the joint venture's formation. Solutia, however, draws upon cases where no agreement defining the parties' relationship was present. *See Ewen v. Gerofsky*, 86 Misc.2d 913, 382 N.Y.S.2d 651 (Sup.Ct.1976) (recognizing pre-formation duty between joint venturers where parties had not executed a written contract of any kind, and it was undisputed that plaintiff had contributed a series of ideas and inventions to defendant's business before any dispute arose between the parties); *R.C. Gluck & Co. v. Tankel*, 24 Misc.2d 841, 199 N.Y.S.2d 12 (Sup.Ct.1960) (recognizing a preformation duty where there was no written agreement and the defendant *admitted* that he had been in a relationship of trust and confidence with the plaintiff that he had sought to exploit for his own gain); *Tobias v. First City Nat'l Bank and Trust Co.*, 709 F.Supp. 1266, 1278 (S.D.N.Y.1989) (noting that where a partner acted *during the period of the partnership* in a manner that violated representations she made prior to the formation of the partnership, "whatever happened prior" to formation "*may* . . . operate to fasten a duty on each partner.").

Finally, it is well settled that parties in non-fiduciary relationships are free contractually to waive or otherwise alter their prospective fiduciary duties to one another. *See, e.g., Cooper v. Parsky*, 140 F.3d 433, 439 (2d Cir.1998).[3] Based on JVA

---

**3.** *Blue Chip Emerald, LLC v. Allied Partners, Inc.*, 299 A.D.2d 278, 279, 750 N.Y.S.2d 291, 294–95 (1st Dept.2002), upon which Solutia relies, is not to the contrary. In that case, the parties were already in a joint venture relationship and in the process of negotiating a buyout by defendant of the plaintiff co-venturers when the disclaimer was executed. Here,

§ 23.4, which reaffirmed the terms of the Letter Agreement (including its non-disclosure provision), it is clear that the parties did not intend for an affirmative duty of disclosure to exist until the Effective Date. Indeed, the disclaimer of a duty of disclosure makes perfect sense in light of the overall structure of the JVA, which provided merely for the *contingent* and *delayed* creation of a joint venture.

Given the parties' contractual intent not to be bound, and the absence of authority recognizing pre-formation duties between prospective joint venturers in these circumstances, FMC did not owe any duties to Solutia as a co-venturer until the formation of Astaris.

### 2. *Trust and Confidence*

▇ In the alternative, Solutia argues that FMC owed it a fiduciary duty of disclosure because the parties stood in a relationship of trust and confidence as of the signing of the JVA. New York law recognizes such a duty of disclosure only in "informal relationships where it can be readily seen that one party reasonably trusted another." *Brass v. Am. Film Tech., Inc.*, 987 F.2d 142, 150–51 (2d Cir. 1993). "Examples of such informal fiduciary relationships ... include 'priest and parishioner, bank and depositor, majority and minority stockholder, and close friends or family members.'" *Brass*, 987 F.2d 142 at 151. However, "[t]here is no reason to expand the class of informal fiduciary relationships to include ... parties participating in ... an arms-length transaction." *Brass*, 987 F.2d 142 at 151.

Solutia and FMC were sophisticated parties, represented by experienced corporate counsel, who negotiated a 39–page contract to define their relationship.

FMC and Solutia were not in a fiduciary relationship when they executed the JVA and

Clearly, the negotiation of the JVA was conducted at arms-length. With respect to the relationship of the parties after the execution of the JVA, but before the creation of Astaris, this Court has already determined that (1) the parties were not bound together as joint venturers until the Effective Date; (2) the JVA and Letter Agreement provided that neither party had to provide the other with any confidential information; and (3) the parties expressly contemplated that they would each continue to perform due diligence until the Effective Date. In light of these contractual terms, the Court finds as a matter of law that Solutia could not have reasonably placed trust and confidence in FMC with respect to its PPA technology in a manner giving rise to a fiduciary duty.

Solutia argues that once the parties engaged in certain cooperative activities after the execution of the JVA, it was entitled to place trust and confidence in FMC with respect to the quality of its PPA technology. Notably, Solutia does not contend that any of the parties' cooperative activities after the execution of the JVA actually related to FMC's PPA technology until the formation of Astaris. "The mere unilateral investment of confidence by one party in the other ordinarily will not suffice to saddle the parties with the obligations and duties of a confidential relationship.... The confidence reposed by one party must be accepted by the other party." *Litton Industries, Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 767 F.Supp. 1220, 1231–32 (S.D.N.Y.1991) (quoting *United States v. Reed*, 601 F.Supp. 685, 715 (S.D.N.Y. 1985)), *rev'd in part on other grounds*, 773 F.2d 477 (2d Cir.1985). Accordingly, in view of the contractual language already

disclaimed any duty of disclosure.

discussed, there is no genuine issue of material fact in respect of this argument.

### 3. *Peculiar Knowledge*

 Solutia also contends that FMC owed it a duty of full disclosure because FMC possessed superior knowledge about its PPA technology and knew Solutia was acting on mistaken knowledge. As a general rule, "[w]hen matters are held to be peculiarly within defendant's knowledge, it is said that plaintiff may rely [on defendant's representations] without prosecuting an investigation, as he has no independent means of ascertaining the truth." *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80 (2d Cir.1980). However, "the more sophisticated the buyer, the less accessible the information must be to be considered within the seller's peculiar knowledge." *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, No. 02 Civ. 7689(HB), 2005 WL 832050, at *7 (S.D.N.Y. Apr. 12, 2005). And, when a sophisticated party *knows* that it is not receiving full information, it may be barred from relying on the peculiar knowledge of its counterparty. *See, e.g., Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1543 (2d Cir.1997); *DynCorp v. GTE Corp.*, 215 F.Supp.2d 308, 322 (S.D.N.Y.2002).

 Here, it is undisputed that FMC possessed superior knowledge of its PPA technology, but there are factual disputes regarding the amount of information Solutia possessed about PPA technology in general, as well as the nature, extent and timing of FMC's disclosures in respect of its particular PPA technology. Accordingly, summary judgment is inappropriate on whether FMC had a duty to disclose concerning its PPA technology.

 Finally, FMC argues that irrespective of any duty arising out of its peculiar knowledge of wet process technology, it is entitled to summary judgment on

Solutia's claim for breach of fiduciary duty because the disclaimers and merger clauses in the Letter Agreement and JVA bar Solutia from establishing reasonable reliance. This argument is without merit. "[A]llegedly fraudulent [parties] may not invoke even specific disclaimer clauses in order to preclude evidence of oral misrepresentations if the facts allegedly misrepresented are peculiarly within [that party's] knowledge." *Yurish v. Sportini*, 123 A.D.2d 760, 761–62, 507 N.Y.S.2d 234, 235 (2d Dep't 1986) (quotation omitted); *See also Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co.*, 149 F.3d 134, 136 (2d Cir.1998); *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 322, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959).

### C. *Negligent Misrepresentation*

 Under New York law, a claim of negligent misrepresentation requires a demonstration that: (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment. *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir.2000). The circumstances giving rise to a "special relationship" are limited and "liability for negligent misrepresentation has been imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 788 (2d Cir.2003) (quoting *Kimmell v. Schaefer*, 89 N.Y.2d

257, 263, 652 N.Y.S.2d 715, 675 N.E.2d 450 (1996)).

■ FMC argues that it is entitled to summary judgment on this claim because it owed no duty of disclosure to Solutia. As discussed above, the parties were not joint venturers or in a relationship of trust and confidence giving rise to a duty of disclosure until the formation of Astaris in April 2000. However, because a trial is necessary to determine whether FMC's peculiar knowledge of its PPA technology gave rise to a duty of disclosure upon which Solutia was entitled to rely, summary judgment on this claim is not appropriate.

### D. *Solutia's Fraud Claims*

■ Broadly construed, the Complaint alleges fraudulent inducement, fraudulent misrepresentation and fraudulent concealment. These are "different causes of action and demand different elements of proof." *See, e.g., Lazard,* 108 F.3d at 1542 (quoting *Congress Fin. Corp. v. John Morrell & Co.,* 790 F.Supp. 459, 469 (S.D.N.Y. 1992)); *see also Computerized Radiological Servs. v. Syntex Corp.,* 786 F.2d 72, 76 (2d Cir.1986) (stating that fraudulent inducement claim requires proof (1) that the defendant made a representation, (2) as to a material existing fact, (3) which was false, (4) and known to be false by the defendant, (5) that the representation was made for the purpose of inducing plaintiff to rely upon it, (6) that plaintiff reasonably did so rely, (7) in ignorance of its falsity, (8) to her injury); *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 153 (2d Cir.1995); *Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 276 (2d Cir.1992); *Mallis v. Bankers Trust Co.,* 615 F.2d 68, 80 (2d Cir.1980) (stating that in actual fraud claim the elements to be established are (1) a material misrepresentation or omis-

sion of fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff); *Congress Fin. Corp.,* 790 F.Supp. at 472 (stating that claim for fraudulent concealment requires (1) a relationship between contracting parties that creates a duty to disclose, (2) knowledge of material facts by a party bound to make such disclosures, (3) nondisclosure, (4) scienter, (5) reliance, and (6) damage). For the reasons discussed above, there are material disputes of fact precluding summary judgment on all of these theories.

### E. *Adequacy of Pleadings on All Tort Claims*

■ FMC argues that Solutia's tort claims should be limited to the specific representations and omissions pleaded with particularity in the Complaint. Fed. R.Civ.P. 9(b) provides, in relevant part: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake must be stated with particularity." This heightened pleading standard is designed "(1) to provide a defendant with fair notice of the plaintiff's claim, (2) to protect a defendant from harm to his or her reputation or goodwill, and (3) to reduce the number of strike suits." *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989) (quoting *Stern v. Leucadia Nat'l Corp.,* 844 F.2d 997, 1003 (2d Cir.1988)). To meet the standards of Rule 9(b), allegations of fraud must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994) (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)). "In instances where the alleged fraud is premised on an

omission, a plaintiff must specify the person responsible for the failure to speak, the context of the omission, and the manner in which the omission misled the plaintiff." *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*, 85 F.Supp.2d 282, 293 (S.D.N.Y.2000). Solutia does not dispute that its tort claims (including its claims for negligent misrepresentation and breach of fiduciary duty) are subject to the pleading standard of Rule 9(b). However, it contends that its claims should not be limited to specific representations and omissions pleaded in the complaint because it is entitled to employ evidence obtained as part of discovery to prove its case.

▮▮▮ FMC is entitled to understand the nature of the claims asserted against it and the evidence on which Solutia intends to rely. However, Rule 9(b) is typically invoked on motions to dismiss. It is not the appropriate device to vindicate FMC's rights at this stage of the proceedings. Among other things, invocation of Rule 9(b) would work severe hardship on Solutia and prevent it from utilizing evidence obtained in discovery as part of its claims. Accordingly, FMC's Rule 9(b) motion is denied.

The Court is mindful that discovery is closed. Nevertheless, in view of the complexity of the claims and the importance of clarifying disputed issues in advance of trial, the parties are directed to confer promptly regarding the need for supplemental responses by Solutia to FMC's contention interrogatories.

### F. *Solutia's Motion to Dismiss FMC's "Duty to Inquire" Defense*

Solutia moves for the dismissal of FMC's Eleventh Affirmative Defense, which alleges:

Because Solutia was knowledgeable about wet-processed PPA Technology

and the impact different ores could have on the production of PPA, Solutia could not reasonably rely on any representations FMC may have made regarding the adaptation of FMC's PPA Technology to the Conda Plant, and further had a duty to inquire about the omission of any information it knew or should have known was material.

Solutia raises two inter-related arguments: first, that the defense is inapposite in this action because FMC admits it would have refused any inquiries for further information; and second, that the defense is inconsistent with FMC's fiduciary duty of disclosure under New York law. These arguments are without merit.

▮▮▮▮ First, FMC's admitted refusal to disclose most information about its PPA technology does not bar its defense. As a matter of law, Solutia was a sophisticated party that had a duty to protect itself from misrepresentations. *Lazard*, 108 F.3d at 1543. "[W]here, as here, a party has been put on notice of the existence of material facts which have not been documented and he nevertheless proceeds with a transaction without securing the available documentation *or inserting appropriate language in the agreement for his protection*, he may truly be said to have willingly assumed the business risk that the facts may not be as represented." *Lazard*, 108 F.3d at 1543 (quoting *Rodas v. Manitaras*, 159 A.D.2d 341, 552 N.Y.S.2d 618, 620 (1st Dept.1990) (emphasis in original)); *see also DynCorp*, 215 F.Supp.2d at 322 ("Sophisticated parties to major transactions cannot avoid their disclaimers by complaining that they received less than all information, for they could have negotiated for fuller information or more complete warranties."); *Curran, Cooney, Penney, Inc. v. Young & Koomans, Inc.*, 183 A.D.2d 742, 583 N.Y.S.2d 478, 479 (2d Dept.1992). "Succinctly put, a party will not be heard to complain that he has been defrauded when it is his own evident lack

of due care which is responsible for his predicament." *Lazard,* 108 F.3d at 1543.

In this action, Solutia admits that the "most critical contribution" to the transaction with FMC was FMC's PPA technology. (Pl.'s 56.1 Stmt. ¶ 12.) It is also undisputed that FMC refused to disclose details about its PPA technology, and that Solutia *knew* FMC was so refusing—indeed, this refusal was memorialized in both the Letter Agreement and the JVA. (Pl.'s 56.1 Stmt. ¶¶ 12–19; Letter Agreement § 3, 4; JVA § 23.4.) To be sure, these facts do not necessarily bar recovery on the theory that FMC had peculiar knowledge of its own PPA technology. However, Solutia's knowledge about PPA technology in general (and FMC's PPA technology in particular) is disputed, as is the extent to which Solutia could reasonably rely on FMC's disclosures. It is also unclear whether Solutia could reasonably have been expected to insist on stronger contractual protections based on the information available to it during the relevant period. These are issues of fact requiring a trial.

Further, as already discussed, FMC owed no general fiduciary duty to Solutia under New York law, and the asserted defense thus cannot be inconsistent with such a duty. To the extent a duty of disclosure existed, it arose out of FMC's peculiar knowledge of its PPA technology, and a plaintiff's duty to protect itself may apply even in circumstances where the defendant had peculiar knowledge of the relevant facts. *See, e.g., Lazard,* 108 F.3d at 1542–43. For these reasons, Solutia's motion to dismiss FMC's Eleventh Affirmative Defense is denied.

### G. *FMC's Comparative/Contributory Negligence Defense*

Solutia also moves for the dismissal of FMC's Twelfth Affirmative Defense, which states:

Solutia was negligent in failing to conduct any due diligence on FMC's PPA Technology either before or after the execution of the Joint Venture Agreement, and it [sic] thus barred by the doctrine of comparative and/or contributory negligence from recovering all or part of the damages to which it asserts a right should FMC be found liable on any of Solutia's causes of action.

Under New York law, the defenses of "comparative and/or contributory" negligence are governed by N.Y. C.P.L.R. 1411, which provides:

In any action to recover damages for personal injury, injury to property, or wrongful death, the culpable conduct attributable to the claimant or to the decedent, including contributory negligence or assumption of risk, shall not bar recovery, but the amount of damages otherwise recoverable shall be diminished in the proportion which the culpable conduct attributable to the claimant or decedent bears to the culpable conduct which caused the damages.

At issue is the applicability of this provision to Solutia's remaining claims.

### 1. *Breach of Contract*

█ Notwithstanding the apparently broad language of the statute, FMC cites no case that permits a party to escape enforcement of a contract on the basis of contributory or comparative negligence. Nor does FMC provide any persuasive justification for why there should be such a defense. Accordingly, FMC's Twelfth Affirmative Defense is dismissed with respect to Solutia's breach of contract claim. *See Bank Brussels Lambert v. Chase Manhattan Bank, N.A.,* No. 93 Civ. 5298(LMM), 1999 WL 710778, at *3 (S.D.N.Y. Sept. 10, 1999). Of course,

FMC remains free to submit evidence regarding causation or damages at trial.

### 2. *Negligent Misrepresentation*

Claims for negligent misrepresentation are covered by C.P.L.R. 1411. *See Ahluwalia/Shetty v. Kidder, Peabody & Co., Inc.*, No. 93 Civ. 1261(TPG), 1998 WL 122592, at * 1 (S.D.N.Y. Mar. 18, 1998) ("[N]egligent misrepresentation is a tort and is subject to apportionment for comparative fault under New York's comparative fault statute." (citation omitted)); *see also Brown v. Neff*, 175 Misc.2d 151, 668 N.Y.S.2d 873 (Sup.Ct.1997). Accordingly, Solutia's motion to dismiss FMC's Twelfth Affirmative Defense with respect to this claim is denied.

### 3. *Breach of Fiduciary Duty*

There are conflicting authorities on the question of whether claims for breach of fiduciary duty are covered by C.P.L.R. 1411. *Compare Scott v. Dime Sav. Bank of New York, FSB*, 886 F.Supp. 1073 (S.D.N.Y.1995) (holding that a jury's comparative fault findings could not reduce a damages award for breach of fiduciary duty), *aff'd*, 101 F.3d 107 (2d Cir.1996), *cert. denied*, 520 U.S. 1122, 117 S.Ct. 1260, 137 L.Ed.2d 339 (1997); *Conway v. Icahn & Co., Inc.*, 16 F.3d 504, 511 (2d Cir.1994) (noting in dicta that "[a] full award for breach of fiduciary duty could not be reduced for contributory negligence") *with Coty v. Steigerwald*, 262 A.D.2d 946, 692 N.Y.S.2d 556, 557 (4th Dept.1999) ("[C]omparative fault principles may be applied to a cause of action for breach of fiduciary duty.") *Bank Brussels*, 1999 WL 710778, at *1–2 ("There is no logical reason why, where an intentional tort on the part of the defendant is shown to be only a partial cause of a plaintiff's loss, the plaintiff should nevertheless also recover a further part of its loss shown to have been caused

by its own negligence."); *Haran v. New York Metro. Baseball Club, Inc.*, 131 Misc.2d 392, 500 N.Y.S.2d 485, 486 (Sup. Ct.1986) (holding that comparative negligence is "an affirmative defense of culpability to a cause of action that pleads an intentional tort"). Given the conflicting precedent, this Court follows the suggestion of the Second Circuit in *Conway*, and declines to recognize a comparative negligence defense in the context of a claim for breach of fiduciary duty. *See Conway*, 16 F.3d at 511. Therefore, Solutia's motion to dismiss FMC's Eleventh Affirmative defense is granted with respect to Solutia's claim for breach of fiduciary duty.

### 4. *Fraud*

"Contributory or comparative negligence is not a defense to fraud." *Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 36 F.Supp.2d 560, 575 (E.D.N.Y.1999). Accordingly, this Court finds that C.P.L.R. 1411 is inapplicable to Solutia's fraud claim against FMC, and FMC's Twelfth Affirmative Defense is dismissed with respect to that claim.

### III. *Limitations on Damages*

The parties' arguments on damages can be cabined into three issues: (1) whether Solutia is entitled to rescission of the JVA; (2) whether Solutia is entitled to expectancy damages on its tort claims; and (3) whether Solutia is entitled to punitive damages.

Solutia concedes that it is not entitled to rescind the JVA, arguing instead that it is entitled to rescissionary damages. While the parties disagree on the availability of rescissionary damages, their dispute is more about labeling than consequences as they do not dispute that the appropriate method for calculating damages is the "out-of-pocket" standard measuring what-

ever damages were proximately caused by FMC's alleged breaches. *See Lam v. Am. Express Co.,* 265 F.Supp.2d 225 (S.D.N.Y. 2003). Solutia contends that FMC's breaches caused it to make *all* of its out-of-pocket contributions to Astaris, while FMC, not surprisingly, takes a narrower view. In any event, the amount of out-of-pocket damages will depend upon many factors, including the precise nature of the defendant's wrongdoing. FMC's motion to preclude rescission as a remedy on Counts V, VI and VII is granted.

As to the second part of FMC's application, New York law does not allow a plaintiff to recover expectancy damages in an action based in fraud. "[O]ut-of-pocket rather than benefit-of-the-bargain damages are awarded for fraud." *Ostano Commerzanstalt v. Telewide Sys., Inc.,* 794 F.2d 763, 766 (2d Cir.1986). Put differently, "all elements of profit are excluded from a computation of damages in an action grounded in fraud." *AFA Protective Sys., Inc. v. AT & T Co., Inc.,* 57 N.Y.2d 912, 914, 456 N.Y.S.2d 757, 442 N.E.2d 1268 (1982). Thus, Solutia is not entitled to receive "benefit of the bargain," or lost profits, as damages on its fraud claims.

Finally, New York law provides that fraudulent conduct may give rise to punitive damages. *See Flaks v. Koegel,* 504 F.2d 702, 707 (2d Cir.1974); *Wallach,* 675 F.Supp. at 842; *Beir v. Mfrs. Hanover Trust Co.,* 110 A.D.2d 529, 488 N.Y.S.2d 1 (1st Dept.1985). However, "mere fraud is insufficient to support a claim of punitive damages," which "[are] available only where [the] defendant acts with evil and reprehensible motives." *Wallach Marine Corp. v. Donzi Marine Corp.,* 675 F.Supp. 838, 842 (S.D.N.Y.1987); *see also China Trust Bank of N.Y. v. Standard Chartered Bank,* 981 F.Supp. 282, 290 (S.D.N.Y. 1997). Whether any fraud committed by FMC warrants punitive damages is a question for trial. *See China Trust,* 981 F.Supp. at 290 (noting that the availability of punitive damages is a matter to be decided after all evidence has been admitted at trial).

IV. *FMC's Motion to Strike Solutia's Jury Demand*

FMC moves to strike Solutia's demand for a jury trial on the ground that Solutia waived its right to trial by jury in the JVA. FMC's argument is founded on Section 25 of the JVA, entitled "Dispute Resolution Procedures," which provides, in relevant part:

> At any time after the date of this Agreement for so long as both the FMC Group and the Solutia Group own an interest in the Joint Venture, at the request of either party in a written notice to the other party's appointees to the Board, the parties agree to negotiate in good faith to resolve expeditiously any controversies, claims or disputes between the parties *that may arise from time to time under this Agreement or otherwise. relating to the Joint Venture* ... in *connection with any judicial proceedings, if any, with respect to such matter, both parties agree to waive their rights, if any, to a jury trial,* and further agree that they will not assert in any such legal proceedings as a defense any statute of limitations or a claim of laches ....

JVA § 25.1 (Ex. 10) (emphasis added).

Fed.R.Civ.P. 38 governs whether Solutia is entitled to a jury trial. See Fed.R.Civ.P. 38; *Great Earth Int'l Franchising Corp. v. Milks Dev.,* 311 F.Supp.2d 419, 437–38 (S.D.N.Y.2004). The Seventh Amendment right to a jury is fundamental and its protection can only be relinquished knowingly and intentionally.

*Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); *Heyman v. Kline,* 456 F.2d 123, 129 (2d Cir.1972). Indeed, a presumption exists against its waiver. *Aetna Ins. Co. v. Kennedy,* 301 U.S. 389, 393, 57 S.Ct. 809, 81 L.Ed. 1177 (1937). However, "a waiver may be upheld if the party attempting to enforce it is able to prove that the waiver was entered into knowingly, intentionally and voluntarily ... Moreover, despite the close scrutiny which the Court will apply to the enforcement of any jury waiver, most notably in the determination of whether a waiver was entered knowingly, intentionally, and voluntarily, jury trial waivers are commonly upheld." *Wechsler v. Hunt Health Sys., Ltd.,* No. 94 Civ. 8294(PKL), 2003 WL 21878815, at *2 (S.D.N.Y. Aug. 8, 2003). "The factors a court must consider in determining whether a contractual waiver of a right to a jury trial was entered into knowingly and voluntarily include: (1) the negotiability of contract terms and negotiations between the parties concerning the waiver provision; (2) the conspicuousness of the waiver provision in the contract; (3) the relative bargaining power of the parties; and (4) the business acumen of the party opposing the waiver." *Morgan Guar. Trust Co. of New York v. Crane,* 36 F.Supp.2d 602, 603–04 (S.D.N.Y.1999) (citing *Sullivan v. Ajax Navigation Corp.,* 881 F.Supp. 906, 911 (S.D.N.Y.1995)).

▮ It is undisputed that the JVA was fully negotiated by both sides with the assistance of counsel. The jury waiver provision is not "buried" in the JVA but is part of a general dispute resolution clause. Solutia further admits its commercial and legal sophistication. Accordingly, this Court finds that the jury waiver in Section 25.1 of the JVA is enforceable against Solutia with respect to all claims "aris[ing] ... under ... [the JVA] or otherwise relating to the Joint Venture." JVA § 25.1

(emphasis added), including all claims at issue in this case.

Solutia contends that the language in the JVA's jury waiver clause does not encompass fraudulent inducement claims. However, the weight of authority in this District is overwhelmingly to the contrary where, as here, the fraudulent inducement claim does not focus specifically on the jury waiver clause. *See Russell–Stanley Holdings, Inc. v. Buonanno,* 327 F.Supp.2d 252, 257–58 (S.D.N.Y.2002) (enforcing jury waiver clause on fraudulent inducement claims where party did not allege fraudulent inducement as to the jury waiver clause itself); *Ameritrust Co. Nat'l Ass'n v. Dew,* No. 90 Civ. 7709(RWS), 1992 WL 84479, at *6 (S.D.N.Y. Apr. 14, 1992) (same); *Merrill Lynch & Co. v. Allegheny Energy, Inc.,* 382 F.Supp.2d 411, 422–24 (S.D.N.Y.2003) (same); *but see Nat'l Union Fire Ins. Co. of Pittsburgh v. Burger,* No. 86 Civ. 8633(LLS), 1991 WL 197625, at *3 (S.D.N.Y. Sept. 24, 1991) (holding that a defendant in a breach of contract action was entitled to a jury trial on his defense that the instrument was void because fraudulently induced). In this case, Solutia's averments of fraud do not relate specifically to the jury waiver clause and its argument that it is entitled to a jury trial on its fraud claims is therefore without merit.

## CONCLUSION

For the foregoing reasons, Solutia's motion for summary judgment is granted in part and denied in part. Specifically, Solutia's motion for summary judgment is granted to the extent that FMC's Twelfth Affirmative Defense (contributory or comparative negligence) is dismissed as to Solutia's claims for breach of contract, breach of fiduciary duty and fraud. Solutia's motion for summary judgment is denied with

respect to Count V (breach of fiduciary duty) and FMC's Eleventh Affirmative Defense (asserting that Solutia's knowledge of wet process PPA technology imposed a duty of inquiry).

FMC's motion for summary judgment is granted in part and denied in part. Specifically, FMC's motion is granted with respect to Count V (breach of fiduciary duty), Count VI (negligent misrepresentation) and Count VII (fraud) to the extent that these claims are based on allegations that FMC owed Solutia a duty of disclosure arising out of a joint venture relationship or some other special relationship of trust and confidence prior to April 2000. FMC's motion is denied with respect to Counts V, VI and VII to the extent that these claims are based on its superior or peculiar knowledge of wet process PPA technology. FMC's motion is also denied with respect to Count II (breach of contract) in its entirety.

FMC's motion to strike Solutia's jury demand is granted.

In all other respects, both Solutia's and FMC's motions for summary judgment are denied.

SO ORDERED.

## ORDER

PAULEY, District Judge.

FMC Corporation ("FMC") moves pursuant to Local Rule 6.3 for partial reconsideration of this Court's Memorandum and Order, dated July 31, 2006. *Solutia, Inc. v. FMC Corp.*, 456 F.Supp.2d 429, 2006 WL 2109430 (S.D.N.Y.2006) (*"Solutia I"*). For the reasons set forth below, FMC's motion is denied.

## BACKGROUND

The factual and procedural background of this action is set forth in the Court's prior Memoranda and Orders, familiarity with which is assumed. *See Solutia I*, 456 F.Supp.2d 429, 2006 WL 2109430; *Solutia, Inc. v. FMC Corp.*, 385 F.Supp.2d 324 (S.D.N.Y.2005). The Complaint asserts claims for breach of contract, breach of fiduciary duty, negligent misrepresentation and fraud. In October 2005, FMC moved for summary judgment on various issues, including Solutia, Inc.'s ("Solutia") claim for breach of fiduciary duty. This Court denied FMC's motion with respect to the breach of fiduciary duty claim. The Court reasoned that a trial was necessary to determine whether Solutia had relied on FMC's representations regarding facts of which FMC had superior knowledge at the time the parties decided to form their joint venture. FMC seeks reconsideration of that portion of the Court's Memorandum and Order, arguing that, as a matter of law, a breach of fiduciary duty claim cannot be premised on a duty arising out of one party's superior knowledge.

## DISCUSSION

I. *Standard on a Motion for Reconsideration*

A motion for reconsideration under Local Rule 6.3 "will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir.1995). Such a motion "cannot assert new arguments or claims which were not before this court on the original motion." *Koehler v. Bank of Berm., Ltd.*, No. M18–302 (CSH), 2005 WL 1119371, at *1 (S.D.N.Y. May 10, 2005). The decision to grant or deny a motion for reconsideration is within the sound discretion of the district court. *McCarthy v. Manson*, 714 F.2d 234, 237 (2d Cir.1983).

## II. *Superior Knowledge and Fiduciary Duty*

■■■ Absent "extraordinary circumstances," New York law does not recognize the existence of a fiduciary duty between sophisticated commercial entities contracting at arm's length. *See, e.g., In re Mid–Island Hosp., Inc.*, 276 F.3d 123, 130 (2d Cir.2002). Nonetheless, New York law does recognize that a fiduciary duty may arise out of "a relationship of confidence, trust, or superior knowledge or control." *Broadway Nat'l Bank v. Barton–Russell Corp.*, 154 Misc.2d 181, 585 N.Y.S.2d 933, 945 (Sup.Ct.1992). In particular, a fiduciary duty may arise from a business transaction where "defendant had superior expertise or knowledge about some subject and misled plaintiff by false representations concerning that subject." *Talansky v. Schulman*, 2 A.D.3d 355, 770 N.Y.S.2d 48, 53 (1st Dep't 2003); *see also Stuart Silver Assocs., Inc. v. Baco Dev. Corp.*, 245 A.D.2d 96, 99–100, 665 N.Y.S.2d 415 (1st Dep't 1997) (same); *Calvin Klein Trademark Trust v. Wachner*, 123 F.Supp.2d 731, 734 (S.D.N.Y.2000) (a fiduciary duty may arise in the context of an arm's length negotiation in circumstances where the "superior access [of one party] to confidential information is so great as virtually to require the other party to repose trust and confidence in the first party").

FMC contends that a party cannot owe a fiduciary duty based solely on its possession of superior knowledge. FMC relies on a line of cases including *Granat v. Ctr. Art Galleries—Hawaii, Inc.*, No. 91 Civ. 7252(RLC), 1993 WL 403977 (S.D.N.Y. Oct. 6, 1993) and *Batas v. Prudential Ins. Co. of Am.*, 281 A.D.2d 260, 724 N.Y.S.2d 3 (1st Dep't 2001). However, none of these cases holds that the superior knowledge doctrine cannot support a claim for breach of fiduciary duty. To the contrary, the cases hold only that the superior knowledge doctrine does not apply in the context of every commercial negotiation where one party has greater expertise or knowledge than another. This action, by contrast, involves a situation where confidential and proprietary technology that goes to the heart of the parties' agreement is alleged to have been within the exclusive control of one of the parties to the negotiation. Accordingly, the cases cited by FMC are inapposite.

In a similar vein, FMC argues that Solutia's general commercial sophistication precludes a determination that FMC owed it a fiduciary duty arising out of FMC's superior knowledge of its purified phosphoric acid ("PPA") technology. FMC relies principally on *Calvin Klein* and *Stuart Silver*, both of which declined to recognize the existence of a fiduciary duty in situations where all parties to a transaction were sophisticated. *Calvin Klein*, 123 F.Supp.2d at 734 (declining to apply the superior knowledge doctrine in holding that a trademark licensor did not owe a fiduciary duty to a sophisticated licensee); *Stuart Silver*, 245 A.D.2d at 100, 665 N.Y.S.2d 415 (declining to apply the superior knowledge doctrine in the context of a real estate transaction where plaintiff could have performed due diligence and discovered facts that were not uniquely under defendant's control). Again, however, neither of these cases involved a situation where specific facts at the heart of a joint venture were within the knowledge and control of only one party to the transaction.

In sum, FMC fails to "point to controlling decisions or data that the court overlooked" in its prior Memorandum and Order. *Shrader*, 70 F.3d at 257. Because this action involves a dispute of fact with respect to the extent of both parties' knowledge of PPA technology generally, and FMC's PPA technology in particular,

a trial is necessary to determine whether FMC owed Solutia a fiduciary duty.

## CONCLUSION

For the foregoing reasons, FMC's motion for reconsideration is denied.